## COMMONWEALTH *vs.* CURTIS MITCHELL.

Bristol. December 6, 2002. - January 24, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Perjury. Rules of Professional Conduct. Constitutional Law,* Assistance of counsel. *Practice, Criminal,* Assistance of counsel, Presence of defendant, New trial, Costs. *Due Process of Law,* Fair trial. *Evidence,* Exculpatory, Failure to produce evidence. *Rules of Criminal Procedure. Words,* "Know."

This court adopted the firm basis in fact standard to determine what an attorney must "know" in accordance with Mass. R. Prof. C. 3.3 (e), 426 Mass. 1383 (1998), before concluding that his or her client's testimony at trial will be perjurious. [545-547]

A criminal defendant's trial attorney acted properly under Mass. R. Prof. C. 3.3 (e), 426 Mass. 1383 (1998), when he advised the judge at trial that the defendant would testify and present false testimony to the jury, that counsel had attempted to persuade the defendant from testifying falsely, that counsel had decided that he would not seek to withdraw from representing the defendant in the ongoing trial, and that counsel needed instruction from the judge on how to proceed before the jury, where the record amply supported the judge's finding that counsel had a firm basis in objective fact for his good faith determination that the defendant intended to commit perjury. [547]

Although a criminal defendant should have been present at a sidebar conference during which his trial counsel invoked Mass. R. Prof. C. 3.3 (e), 426 Mass. 1383 (1998), when he concluded that the defendant's testimony would be perjurious, this court agreed with the judge's rulings that addressed the defendant's contentions as to why he should have been present, and concluded that the defendant's absence from the conference was harmless beyond a reasonable doubt. [547-548]

On a motion for a new trial in a criminal case in which defense counsel had concluded that the defendant's testimony would be perjurious, the judge properly rejected the defendant's claim that his trial counsel's invocation of Mass. R. Prof. C. 3.3 (e), 426 Mass. 1383 (1998), had created an actual conflict of interest; further, even assuming that a potential for conflict might exist, the judge correctly concluded that the defendant had made no showing that anything done by his trial counsel caused him prejudice. [548-549]

At a criminal trial in which defense counsel concluded that the defendant's testimony would be perjurious, it was of no consequence that the defendant's trial counsel informed the judge, in the prosecutor's presence, of his intention to invoke Mass. R. Prof. C. 3.3 (e), 426 Mass. 1383 (1998). [549]

On a motion for a new trial in a criminal case in which the defendant's trial counsel had invoked Mass. R. Prof. C. 3.3 (e), 426 Mass. 1383 (1998), when he concluded that the defendant's testimony would be perjurious, the judge correctly concluded that the defendant was not denuded of a defense by trial counsel's use of a narrative form of testimony by the defendant, where the testimony was placed before the jury, and the defendant's trial counsel made a persuasive, well-reasoned closing argument to the jury. [549-550]

At a criminal trial in which the defendant's trial counsel invoked Mass. R. Prof. C. 3.3 (e), 426 Mass. 1383 (1998), when he concluded that the defendant's testimony would be perjurious, the judge reasonably concluded that it was not necessary to conduct a colloquy with the defendant, as the defendant had made a voluntary and knowing waiver of the assistance of counsel with respect to his own testimony and the defendant was not deprived of any right by the lack of the colloquy. [550]

Statement summarizing the interplay of duties imposed on a criminal defense lawyer (zealous advocacy, preservation of client confidences, avoidance of a conflict of interest) and the constitutional rights granted a defendant (effective legal representation, opportunity to testify in his own defense, right to a fair trial) when a defense counsel invokes Mass. R. Prof. C. 3.3 (e), 426 Mass. 1383 (1998), upon concluding that his client's testimony would be perjurious. [550-553]

At a murder trial, the judge properly denied the defendant's motion to dismiss indictments on the ground that the Commonwealth lost potentially exculpatory evidence, namely, blood evidence on a pair of scissors recovered at the site of the killing, where the judge expressly found that there was no bad faith or negligence on the part of the prosecution, and no potential prejudice to the defendant from the loss of the substance on the scissors; moreover, the judge permitted the defendant's attorney to argue to the jury that the police's inexcusable loss of evidence could raise a reasonable doubt as to the defendant's guilt. [553-554]

On a motion for a new trial in a criminal case, the judge properly rejected the defendant's claims of ineffective assistance of counsel based on the defendant's trial counsel's alleged failure to interview certain witnesses, failure to object to commentary on a witness's credibility by a State trooper and failure to offer the witness's exculpatory statements, and failure to object when the prosecutor argued that a witness had identified the defendant. [554]

On a motion for a new trial in a criminal case, the judge properly denied the defendant's motion for funds to hire an investigator to interview exculpatory witnesses for the purpose of providing factual support for the claim that his trial counsel was ineffective, where the record supported the judge's conclusion that the defendant failed to present a meritorious ground for a new trial, since the exculpatory aspects of testimony expected from the witnesses had either been brought to the attention of the jury in some manner or would not have accomplished anything material for the defense. [555]

INDICTMENTS found and returned in the Superior Court Department on September 19, 1996.

The cases were tried before *Raymond J. Brassard,* J.; a motion for a new trial, filed on September 11, 2000, and a motion for investigative funds to interview witnesses, filed on November 21, 2001, were heard by him.

*Ruth Greenberg* for the defendant.

*M. Catherine Huddleson,* Special Assistant District Attorney, for the Commonwealth.

*Peter M. Onek,* Committee for Public Counsel Services, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

GREANEY, J. A jury convicted the defendant of two indictments charging murder in the first degree by reason of deliberate premeditation and extreme atrocity or cruelty. The defendant's motion for a new trial was denied by the trial judge, on the basis of affidavits, without an evidentiary hearing. The defendant is represented on appeal by the counsel who represented him in connection with his motion for a new trial. The defendant argues that he was denied constitutionally effective assistance of counsel (and incurred violations of other constitutional rights) when his trial counsel, relying on Mass. R. Prof. C. 3.3 (e), 426 Mass. 1383 (1998), set forth below,[1] advised the judge at trial that the defendant would testify and

---

[1] Paragraph (e) of Rule 3.3 of the Massachusetts Rules of Professional Conduct, 426 Mass. 1383 (1998), entitled, "Candor Toward the Tribunal," provides, in pertinent part:

"In a criminal case, defense counsel who knows that the defendant, the client, intends to testify falsely may not aid the client in constructing false testimony, and has a duty strongly to discourage the client from testifying falsely, advising that such a course is unlawful, will have substantial adverse consequences, and should not be followed. . . . If a criminal trial has commenced and the lawyer discovers that the client intends to testify falsely at trial, the lawyer need not file a motion to withdraw from the case if the lawyer reasonably believes that seeking to withdraw will prejudice the client. If, during the client's testimony or after the client has testified, the lawyer knows that the client has testified falsely, the lawyer shall call upon the client to rectify the false testimony and, if the client refuses or is unable to do so, the lawyer shall not reveal the false testimony to the tribunal. In no event may the lawyer examine the client in such a manner as to elicit any testimony from the client the lawyer knows to be false, and the lawyer shall not argue the probative value of the false testimony in closing argument or in any other proceedings, including appeals."

The rule has separate requirements when the issue arises prior to trial.

present false testimony to the jury, that counsel had attempted to persuade the defendant from testifying falsely, that counsel had decided that he would not seek to withdraw from representing the defendant in the ongoing trial, and that counsel needed instruction from the judge on how to proceed before the jury. After receiving instruction, counsel presented the defendant's testimony in narrative form and made a closing argument that reflected his understanding of his ethical obligations. The defendant also argues that the judge erred by (a) denying a motion to dismiss the indictments because potentially exculpatory evidence had been lost; (b) rejecting his other contentions concerning the effectiveness of his trial counsel; and (c) denying his motion for funds to interview potentially exculpatory witnesses. We find no basis in any of the defendant's arguments to order a new trial. We also conclude that there is no reason to exercise our authority under G. L. c. 278, § 33E, to grant the defendant relief. Accordingly, we affirm the judgments of conviction and the orders denying the motion for a new trial and the motion for funds.

1. The evidence and proceedings at the trial may be summarized as follows. The victims, Sonya Shurtliff and David Allen, were murdered in the late evening of June 13, 1996, in their Fall River apartment, within hours of a drug raid at Julius Adams's nearby apartment that resulted in the seizure of drugs and the arrest of Adams. After posting bail, Adams returned to his apartment and told his wife, Barbara, and the defendant (the defendant resided in the same building as Adams), a friend to whom Adams supplied drugs, that he believed that the victims had furnished the police with the information used to obtain the search warrant. Adams had sold drugs to the victims until April, 1996, when he had an altercation with them. After the dispute, the defendant sold drugs to the victims.

After their conversation, the defendant asked Adams if he wanted to do anything about the fact that the victims had talked to the police. Adams responded that he did not. Later, that night, Adams was on his porch talking with his brother-in-law, Willie Smith, when he saw the defendant. The defendant told

Adams, "I did it." Adams said, "Did what?" The defendant responded, "Sonya and David." The defendant was dressed in black nylon sweat pants, a black sweatshirt and white "glove liners" that were "kind of reddish." The defendant left, and, approximately fifteen minutes later, Adams saw the defendant leave the apartment building carrying a brown backpack.

On the night of the murders, Lorraine Hamilton sold a revolver to the defendant for fifty dollars.[2] The defendant told her the handgun was for the people who "snitch[ed]" on Adams's wife. One week later, the defendant returned to Hamilton stating that the gun did not work properly and only fired off one shot. Hamilton gave back the defendant's fifty dollars.

At approximately 11:30 P.M. that night, Alvin Patterson, who lived in an apartment across from the victims, awoke to a knocking sound. He looked through the peephole in his door and saw the defendant knocking on the door to the victims' apartment. Patterson saw Allen open the door and heard Shurtliff ask, "Who is it?," to which Allen replied, "Curtis." The defendant went into the apartment and the door was closed. Patterson heard music and then what sounded like a "loud branch" snapping. The next morning Patterson and a neighbor discovered the victims' bodies.

At about midnight on June 13, Michelle Freitas, the defendant's former girl friend, arrived at the defendant's apartment. About one hour later, the defendant came home. When the defendant and Freitas went to bed, the defendant knelt down by the side of the bed and prayed. Freitas had never seen the defendant pray before. The defendant then lay in bed staring at the ceiling. Freitas asked him what was wrong. The defendant stated, "You would feel this way if you [had] killed two people too." The next morning, Freitas saw the defendant putting clothes into a garbage bag. The defendant told Freitas that she could not stay because people were going to ask her questions and that he was going away for a couple of days.

The next day, June 14, 1996, Kimberly Gaspar picked the defendant up at the boat terminal in Martha's Vineyard. The

---

[2]Lorraine Hamilton was shown a picture of a revolver found at the crime scene and agreed it was the same type of handgun she had sold to the defendant.

defendant told Gaspar that he had murdered two people over drugs. He stated that he put a pillow over the man's head and shot him, and then strangled the woman. He also told Gaspar that the woman was difficult to kill and that he was glad that the victims' children did not wake up. The defendant stayed at Gaspar's house that night. The next day, the defendant met India Rose and told Rose that he had killed two people because one of them had his uncle's[3] house raided, and they owed him money. The defendant also told Rose that he had shot, stabbed, and strangled the victims, but that they just "wouldn't die."[4]

The defendant saw Freitas again and told her that, when questioned by the police, she should tell them that he had been with her all night. The defendant telephoned Sergeant Joseph Castro of the Fall River police department and indicated that he did not want Castro to talk to Freitas. Freitas was interviewed by the police, and she told the defendant that she had followed the instructions he gave her.

The police interviewed the victims' children, Kia (then three years old) and Tatiana (then five years old). Tatiana told the police that, on the night of the killings, two or three people had been inside the apartment. The girls also told the police that a man named Bobby was playing cards at their apartment when they went to bed. Based on this information, the police investigated a man named Bobby Houston, but eliminated him as a suspect. The police also talked to others and learned that the victims had had disputes with drug sellers and owed them money.

[3]The defendant's reference to his uncle was to Adams. There was no testimony, however, at trial, from either Adams or the defendant, that Adams was the defendant's uncle.

[4]The medical examiner testified that Allen died from a gunshot wound to his head and from approximately twenty stab wounds. He indicated that Shurtliff had died from a gunshot wound to the head and approximately twenty-six stab wounds. The medical examiner concluded that the victims' stab wounds had been inflicted by a knife. The medical examiner testified that Shurtliff had also been strangled.

A bloody steak knife was found at the scene along with a revolver. The revolver contained two discharged cartridges; a live cartridge located between the two discharged cartridges had markings indicating that the revolver had misfired. One of the spent cartridge casings was determined, through ballistics testing, to have been fired by the revolver. No identifiable fingerprints could be obtained from either the knife or the revolver.

On June 27, 1996, the defendant made contact with the Fall River police. After being given Miranda warnings and signing a written Miranda form, the defendant told the police that the victims used to buy drugs through him, and that he bought his drugs from Adams and dealt for Adams. The defendant stated that he went to Martha's Vineyard out of fear of being raided by the police. He indicated his view that more than one person had to have committed the killings because Shurtliff was "a big girl, and . . . it would have taken more than one [person] to hang her." The interrogating officer asked the defendant how he knew Shurtliff had been "hanged," and the defendant said he had just heard that. The defendant said he would help the police in trying to locate the murderers.

The defendant contended at trial that someone else, probably Adams, had killed the victims. The defendant called an analyst employed by Cellmark Diagnostics, who testified that DNA testing excluded the defendant as a source of DNA obtained from hairs found in Shurtliff's hand. The defendant also called Willie Smith. Smith testified that, during the early morning of June 14, 1996, he saw the defendant while talking to Adams on the porch to Adams's apartment. Smith stated that the porch lights were on, that he had not noticed any blood on the defendant's clothing, and that the defendant was not wearing any gloves. He denied paying attention to the conversation between Adams and the defendant.

The defendant testified. After his trial counsel had him state his name, counsel asked, "Mr. Mitchell, what do you wish to tell these jurors?" The defendant then proceeded to testify at length in a narrative fashion. The defendant recounted his dealings with Adams and recounted events that tended to implicate Adams as the killer. The defendant denied that he had killed the victims, denied that he had prayed while with Freitas, denied the statements Freitas, Gaspar, and Rose attributed to him, denied that he had told police not to question Freitas, and denied buying a gun from Hamilton.

The defendant's trial counsel did not argue the defendant's testimony in his closing argument. He emphasized the Commonwealth's high burden of proof and stressed that Adams had a motive to harm the victims. The defendant's trial counsel

stated that the defendant was a small time dealer with no motive to kill the victims. He pointed out inconsistencies in Freitas's story to police and suggested that she had implicated the defendant out of fear of Adams. The defendant's trial counsel emphasized the failure of the police seriously to investigate suspects other than the defendant. He also argued that one of the victims' daughters had identified several people who had been in the victims' apartment, but not the defendant, as the possible killer or killers. He attacked Patterson's credibility based on his criminal record and inconsistent statements to police, and he attacked Adams's credibility, noting that Smith, who had been with Adams when they allegedly met the defendant after the killings, had not observed any blood on the defendant's hands. The defendant's trial counsel further called to the jury's attention the lack of physical evidence tying the defendant to the crimes, and what he considered failures in the police investigation.

2. The defendant's allegations of ineffective assistance of his trial counsel, and related claims of constitutional violations, by reason of his trial counsel's invocation of rule 3.3 (e), arose out of the following events. After both the Commonwealth and defense had rested, the defendant's trial counsel and the prosecutor approached the bench, where the defendant's trial counsel informed the judge that the defendant now wished to testify. In the absence of an objection by the prosecutor, the judge reopened the evidence to permit the defendant (and Smith, Adams's brother-in-law) to testify. The defendant's trial counsel stated that he had concerns about participating in a fraud on the court and could not reveal more without violating the attorney-client privilege, but that he wanted to put the defendant on the stand, ask him his name, and let him tell his story to the jury. The judge then took a recess to read rule 3.3 (e). When the sidebar conference resumed, the defendant's trial counsel indicated that he would remain as counsel in order not to prejudice the defendant. He also assured the judge that he had tried to dissuade the defendant from testifying falsely. The judge instructed the defendant's trial counsel to remain standing during the defendant's narrative testimony on direct and to make objections to the prosecutor's cross-examination one ques-

tion at a time, as appropriate, keeping in mind that he could not assist the defendant in presenting false testimony.

The trial proceeded in accordance with the judge's instructions. When the defendant finished testifying, his counsel was granted a recess to confer with him. The defendant's trial counsel reported back to the judge that he had "carried out [his] responsibilities under the disciplinary rule." The prosecutor then cross-examined the defendant. The defendant's trial counsel did not argue the defendant's testimony during his closing argument, but argued as summarized above. The defendant's request to make an unsworn statement to the jury was denied by the judge.

In his motion for a new trial, the defendant argued that his trial counsel did not have an adequate basis to invoke rule 3.3 (e), that the judge unconstitutionally applied the rule by failing to conduct a colloquy with him, and that his constitutional rights were violated because he was not present at the sidebar when his trial counsel invoked rule 3.3 (e). The defendant also claimed that he should have been afforded the opportunity to be represented by independent counsel, and that he should have been allowed to give an unsworn statement to the jury or to argue his own testimony in closing. In support of his contentions, the defendant offered his affidavit and the affidavit of his trial counsel. In the defendant's affidavit, he stated that "[t]he testimony that I gave at trial was true. I never told [my trial counsel] that I was going to testify falsely and commit perjury." The defendant's trial counsel, in his affidavit, made the following statements:

> "When I first interviewed [the defendant], he told me he did not kill the victims in this case.
>
> "Later on in the course of my representation, he told me that he did. My subjective belief was that this inculpatory story was true. I had no additional inculpatory information other than that provided by the Commonwealth in discovery and by the witnesses at trial. . . .
>
> "Prior to the defendant's testimony, I advised him that he was not permitted to give perjured testimony, and that I could not present perjured testimony or argue it.

"I believed it was perjurious because it contradicted his earlier version of events and was contrary to the evidence provided to me in discovery and presented in the Commonwealth's case.

"The defendant asked me if he could argue his case in addition to my argument. I told him that the judge would not allow it and I thought it would hurt rather than help him. . . ."

In his memorandum of decision, the judge addressed the defendant's argument that his trial counsel "lacked a constitutionally sufficient basis for invoking [r]ule 3.3(e)." The judge noted that the rule applies when counsel "knows" that the defendant intends to commit perjury. The judge reasoned that the rule does not define the term "knows," but the terminology section of the American Bar Association (ABA) Model Rules of Professional Conduct, on which rule 3.3 is based, states that the term "knows" "denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances." The judge rejected the defendant's proposed standard — knowledge beyond a reasonable doubt — concluding that "such a standard is unworkable, as it will be all but impossible, particularly in the crucible of a trial where the evidence is often conflicting and counsel is under enormous stress, for counsel to ever know beyond a reasonable doubt that a defendant's proposed testimony is false." The judge adopted the "lesser but still demanding requirement that counsel have a 'firm factual basis' for concluding that the defendant will commit perjury" before invoking rule 3.3 (e).

The judge rejected the defendant's argument that his trial counsel was required to undertake an independent investigation of the facts before concluding that the defendant's proposed testimony would be perjurious. The judge concluded that the defendant's trial counsel had a "firm factual basis" supporting his decision.[5]

The defendant claimed that trial counsel's invocation of rule 3.3 (e) had created an actual conflict of interest. The judge

---

[5]In so doing, the judge obviously disbelieved and rejected the assertions in the defendant's affidavit.

determined that there was no actual conflict, and assumed that the defendant, at best, could claim only a potential conflict of interest that would require a new trial only on proof of actual prejudice. The judge concluded that actual prejudice had not been demonstrated.

The judge also rejected the defendant's argument that a colloquy was necessary. The judge concluded that rule 3.3 (e) does not require a colloquy, and, importantly, that the defendant fully understood his options and the consequences of his decision to testify in his own defense. The judge found that "the defendant [had] made a voluntary and knowing waiver of the assistance of counsel with respect to his own testimony only, such that the failure to conduct a colloquy did not deprive him of his constitutional rights." The judge found that the defendant's absence from the sidebar conference was error because the conference represented a "critical stage of the proceedings," but that the error was harmless beyond a reasonable doubt. Finally, the judge rejected the defendant's claim that, having his trial counsel forgo a direct examination and not argue his testimony in summation, deprived him of his constitutional rights. The judge's decisions were correct.

a. We first address the defendant's contention that the judge applied the wrong standard to inform the word "knows" in rule 3.3 (e). The question what a criminal defense attorney should do when confronted with client perjury at trial has been a subject of considerable debate. The problem raises both ethical and constitutional concerns. Defense counsel must furnish zealous advocacy and preserve client confidences, but, at the same time, defense counsel has a duty under rule 3.3 (e) to the court. In addition, the problem has constitutional implications by reason of its potential to deprive a defendant of his right to effective assistance of counsel, and his rights to due process and a fair trial, which include his right to testify in his own defense.

Not unexpectedly, courts have adopted differing standards to determine what an attorney must "know" before concluding that his client's testimony will be perjurious. The standards include the following: "good cause to believe the defendant's proposed testimony would be deliberately untruthful," *State* v. *Hischke*, 639 N.W.2d 6, 10 (Iowa 2002); "compelling support,"

*Sanborn* v. *State*, 474 So. 2d 309, 313 n.2 (Fla. Dist. Ct. App. 1985); "knowledge beyond a reasonable doubt," *Shockley* v. *State*, 565 A.2d 1373, 1379 (Del. 1989); a "firm factual basis," *United States ex rel. Wilcox* v. *Johnson*, 555 F.2d 115, 122 (3d Cir. 1977); a "good-faith determination," *People* v. *Bartee*, 208 Ill. App. 3d 105, 108, cert. denied, 502 U.S. 1014 (1991); and "actual knowledge," *United States* v. *Del Carpio-Cotrina*, 733 F. Supp. 95, 99 (S.D. Fla. 1990) (applying "actual knowledge" standard to require firm factual basis). The judge properly rejected standards that were too lenient (good cause to believe) or too rigid, particularly the standard sought by the defendant, knowledge beyond a reasonable doubt. The knowledge beyond a reasonable doubt standard essentially would eviscerate rule 3.3 (e). That standard, as described by one court, is "virtually impossible to satisfy unless the lawyer had a direct confession from his client or personally witnessed the event in question." *State* v. *Hischke*, *supra* at 10. The standard would also tend to compel defense attorneys to remain silent in the face of likely perjury that a sharp private warning could nip in the bud. See *Nix* v. *Whiteside*, 475 U.S. 157, 169 (1986).

The judge correctly settled on the firm basis in fact standard. This standard satisfies constitutional concerns[6] because it requires more than mere suspicion or conjecture on the part of counsel, more than a belief and more information than inconsistencies in statements by the defendant or in the evidence. Instead, the standard mandates that a lawyer act in good faith based on objective circumstances firmly rooted in fact. The lawyer may act on the information he or she possesses, and we decline to impose an independent duty on the part of counsel to investigate because such a duty would be "incompatible with the fiduciary nature of the attorney-client

---

[6]With respect to appellate review, we examine the defendant's constitutional claims on effective assistance of counsel under G. L. c. 278, § 33E, which is more favorable to a defendant than are the Federal or State constitutional standards. *Commonwealth* v. *Frank*, 433 Mass. 185, 187 (2001). See *Strickland* v. *Washington*, 466 U.S. 668 (1984); *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). See also *Commonwealth* v. *Fuller*, 394 Mass. 251, 256 n.3 (1985) ("if the *Saferian* test is met, the Federal test is necessarily met as well"). The § 33E standard governs the defendant's other constitutional contentions as well.

relationship," *United States* v. *Del Carpio-Cotrina, supra* at 99 n.9, and is unnecessary when an attorney relies, in significant part, on incriminating admissions made by the client.

b. Under the standard articulated, we are satisfied that the defendant's trial counsel, a lawyer with thirty-five years' experience, acted properly under rule 3.3 (e). Contrary to the defendant's contentions, his trial counsel was not faced with mere inconsistent statements. Rather, the defendant initially told his trial counsel that he did not kill the victims, but later stated that he had murdered them. The defendant's admission was different in kind from inconsistencies in details, or in statements by a defendant who, under all accounts, consistently denies culpability. The defendant's trial counsel was not faced with mere discrepancies in details told to him by the defendant at various times; he was faced with a direct admission from the defendant's own lips combined with substantial evidence produced by the Commonwealth that corroborated the defendant's admission, including the defendant's incriminating conduct and his inculpatory statements to others. The record amply supports the judge's finding that counsel had a firm basis in objective fact for his good faith determination that the defendant intended to commit perjury.

c. As the judge acknowledged in his posttrial ruling, the defendant should have been present at the sidebar conference during which his trial counsel invoked rule 3.3 (e). The conference was a critical stage of the proceedings. See *Commonwealth* v. *L'Abbe*, 421 Mass. 262, 268 (1995), and cases cited; *Commonwealth* v. *Angiulo*, 415 Mass. 502, 530 (1993). The defendant argues that had he been at the sidebar, he would have been able to convince the judge that his testimony would be truthful; that he would have asked that his trial counsel be discharged and new counsel appointed; and that he would have asked to make his own closing argument and renewed his request to make an unsworn statement to the jury.

The judge disposed of these contentions by pointing out that he would not have accepted the defendant's assertion that his testimony would be truthful; would not have allowed the defendant to make his own closing argument; and would not have reconsidered his previous ruling denying the defendant an

opportunity to make an unsworn statement. As to the possibility of changing counsel, the judge ruled:

> "[I] would not have permitted [the defendant's trial counsel] to withdraw in the middle of a complicated trial and would not have appointed successor counsel. See *Commonwealth* v. *Chavis*, 415 Mass. 703, 711 (1993); *Commonwealth* v. *Quinones*, 414 Mass. 423, 436 (1993) (stating that the denial of a motion to discharge counsel and appoint new counsel during trial is within the judge's sound discretion). Appointment of new counsel would simply have shifted the ethical dilemma from one attorney to another. In addition, it would be entirely impracticable, likely prejudicial, and unworkable to bring in a new lawyer in the middle of a lengthy trial in a murder charge. *Commonwealth* v. *Mascitti*, 534 A.2d 524, 528-529 (Pa. Super. 1987) (concluding that it was not an abuse of discretion for the court to require a defendant who intended to commit perjury to testify in a narrative form rather than declaring a mistrial or allowing the withdrawal of counsel and appointment of new counsel). Moreover, the defendant was not entitled to new counsel who might fail to recognize the problem of fabricated testimony or who might be unethical enough to present it. See *Sanborn* v. *State*, 474 So. 2d 309, 314 (Fla. App. 1985)."

We agree with these rulings, and conclude, as did the judge, that the defendant's absence from the conference was harmless beyond a reasonable doubt. See *Commonwealth* v. *Sleeper*, 435 Mass. 581, 588-589 (2002); *Commonwealth* v. *Owens*, 414 Mass. 595, 603 (1993).

d. The judge properly rejected the defendant's claim that rule 3.3 (e) was so defectively applied "as to create an actual conflict." An actual conflict did not exist. See *Nix* v. *Whiteside*, *supra* at 176 ("If a 'conflict' between a client's proposal and counsel's ethical obligations gives rise to a presumption that counsel's assistance was prejudicially ineffective, every guilty criminal's conviction would be suspect if the defendant had sought to obtain an acquittal by illegal means. Can anyone doubt what practices and problems would be spawned by such a rule and what volumes of litigation it would generate?"). Assuming that a potential for conflict might exist, we agree with

the judge that the defendant has made no showing that anything done by his trial counsel caused him prejudice.

e. It is of no consequence that the defendant's trial counsel informed the judge, in the prosecutor's presence, of his intention to invoke rule 3.3 (e). The defendant's trial counsel did not disclose what expected testimony he believed would be perjurious. Had the defendant's trial counsel left the prosecutor out of his discussions with the judge, the defendant's subsequent testimony in narrative form likely would have been met with strong objection from the prosecutor, thereby drawing the jury's attention to the procedure.

f. The narrative form of testimony was properly directed. This approach was adopted by the ABA in 1971. See ABA Standards for Criminal Justice 4-7.7 (Approved Draft 1971). Although the ABA later rejected this approach and currently suggests that the lawyer may examine as to truthful testimony, and although the approach has been criticized, see *United States v. Long*, 857 F.2d 436, 446 n.7 (8th Cir. 1988), "the narrative [approach] continues to be a commonly accepted method of dealing with client perjury," *Shockley* v. *State*, 565 A.2d 1373, 1380 (Del. 1989). See *Butler* v. *United States*, 414 A.2d 844, 850 (D.C. 1980); *Sanborn* v. *State*, 474 So. 2d 309, 313 & n.3 (Fla. Dist. Ct. App. 1985); *People* v. *Bartee*, 208 Ill. App. 3d 105, 108 (1991). The defendant suggests that his trial counsel should have conducted a direct examination with respect to the "non-suspect" portions of his testimony and should also have argued the truthful portions of the defendant's testimony in his closing argument. The former suggestion has been justifiably criticized by the Criminal Justice Section of the ABA: "[T]his is the worst approach of all. . . . This [approach] would be far worse for the client than saying nothing, not to mention it would be virtually impossible to control once the client takes the stand. And what about cross? How can you possibly prepare your clients for that? Tell them not to answer any questions that they do not like?" ABA Criminal Justice Section, Ethical Problems Facing the Criminal Defense Lawyer at 162 (1995). The latter suggestion is impractical, as it may call attention to testimony of the defendant that is not argued by trial counsel, and would likely lead to counsel's making an incoherent final argument.

We shall not impose these requirements on counsel. Further, to permit the defendant to make an unsworn statement or his own closing argument would allow him to do what rule 3.3 (e) prohibits his counsel from doing, arguing perjured testimony to the jury. The defendant's testimony was placed before the jury, and his trial counsel made a persuasive, well-reasoned closing argument to the jury. The judge correctly concluded that the defendant was not "denude[d]" of a defense.

g. The judge reasonably concluded that it was not necessary to conduct a colloquy with the defendant; that the defendant had made a voluntary and knowing waiver of the assistance of counsel with respect to his own testimony; and that the lack of a colloquy did not deprive the defendant of any right. Although the rule does not require a colloquy, the record will not always be as clear as it is in this case. Thus, a judge, if the situation warrants, has discretion to conduct a colloquy at which a defendant is informed of his right to testify and his right to counsel, his attorney's ethical obligation not to place false testimony before the court, and the consequences of his attorney's invocation of rule 3.3 (e), namely, that the defendant will testify in narrative form and his counsel will not argue his testimony to the jury in summation.[7] Any colloquy should be carefully controlled and conducted to elicit simple "yes" or "no" answers from the defendant, and, if the defendant expresses doubt or misunderstands, he should be directed to consult with counsel until he fully comprehends what rule 3.3 (e) requires.

A summary of our disposition of this issue is now in order.

---

[7] We reject the suggestions in the defendant's brief that the judge should have conducted an evidentiary hearing on whether the defendant's trial counsel had an adequate basis to invoke rule 3.3 (e). An evidentiary hearing, at least in these circumstances, poses a strong likelihood that a defense attorney could improperly reveal, directly or indirectly, client confidences in contravention of the rule's requirement that "the lawyer shall not reveal the false testimony to the tribunal." Mass. R. Prof. C. 3.3 (e), 426 Mass. 1383 (1998). Further, an evidentiary hearing would have been premature, as the perjured testimony had not yet occurred. Examination of a defense counsel's "firm factual basis" for invoking the rule usually will be better left, as it was here, for disposition in connection with a motion for a new trial, in which trial counsel, freed from the constraints of preserving confidences, may express the basis for his invocation of rule 3.3 (e), and describe his efforts to persuade the defendant to testify truthfully.

The duties imposed on a criminal defense lawyer (zealous advocacy, preservation of client confidences, avoidance of a conflict of interest) and the constitutional rights granted a defendant (effective legal representation, opportunity to testify in his own defense, right to a fair trial) are circumscribed by what we demand of honorable lawyers and the core principle of our judicial system that seeks to make a trial a search for truth. The rights of a defendant are not so exclusive that justice can be subrogated to the defendant's perceived interests thereby dismissing or ignoring the interests of victims and the Commonwealth. Perjury, a most serious common-law felony, is antithetical to these values. In Massachusetts it is punishable in a noncapital case by up to twenty years' imprisonment, and in a capital case by possible life imprisonment. G. L. c. 268, § 1.

The standard set forth in rule 3.3 (e) "confirm[s] that the legal profession has accepted that an attorney's ethical duty to advance the interests of his client is limited by an equally solemn duty to comply with the law and standards of professional conduct; it specifically ensures that the client may not use false evidence. This special duty of an attorney to prevent and disclose frauds upon the court derives from the recognition that perjury is as much a crime as tampering with witnesses or jurors by way of promises and threats, and undermines the administration of justice." (Footnote and citation omitted.) *Nix* v. *Whiteside, supra* at 168-169. The standard in no way abridges constitutional rights of a defendant. There is no constitutional or permissible right of a defendant to testify falsely. When defense counsel attempts to persuade a defendant to testify truthfully, counsel is not depriving the defendant of his right to counsel nor the right to testify truthfully. "In short, the responsibility of an ethical lawyer, as an officer of the court and a key component of a system of justice, dedicated to a search for truth, is essentially the same whether the client announces an intention to bribe or threaten witnesses or jurors or to commit or procure perjury. No system of justice worthy of the name can tolerate a lesser standard." *Id.* at 174.

To implement the obligations imposed by rule 3.3 (e), when the question of perjured testimony by a defendant arises, we require, as the rule's knowledge element, that the lawyer, before

invoking the rule, act in good faith and have a firm basis in objective fact. Conjecture or speculation that the defendant intends to testify falsely are not enough. Inconsistencies in the evidence or in the defendant's version of events are also not enough to trigger the rule, even though the inconsistencies, considered in light of the Commonwealth's proof, raise concerns in counsel's mind that the defendant is equivocating and is not an honest person. Similarly, the existence of strong physical and forensic evidence implicating the defendant would not be sufficient. Counsel can rely on facts made known to him, and is under no duty to conduct an independent investigation.

Once the matter is called to the court's attention, the judge should instruct the lawyer on how to proceed. (In evaluating the situation, the judge will have to rely on the representations of counsel, which of necessity will be cryptic, because counsel is the one who must make the disclosure while maintaining client confidences and allowing for continued zealous advocacy at trial.) Before giving instruction, the judge is not required to hold an evidentiary hearing, to appoint an independent lawyer for the defendant, or to conduct a colloquy, although the latter may be appropriate if it appears that the defendant does not clearly understand the situation he has created. It is acceptable for the defendant to testify by means of an open narrative. If the defendant, now informed, moves for appointment of new counsel (and, concomitantly, a mistrial), the judge should deny the motions unless the defendant can demonstrate that such motion must be allowed to prevent a miscarriage of justice. No comprehensive canon can be written on all aspects of practical implementation because each case will have its own idiosyncrasies, and the judge cannot then be informed of the details underlying counsel's invocation of rule 3.3 (e). The judge possesses considerable discretion to vary any of the procedures discussed, if the interests of justice, or effective management of the trial so requires. As here, full exploration of the ramifications of counsel's invocation of rule 3.3 (e) must be postponed until a motion for a new trial, at which time full details may permissibly be revealed.

The judge here anticipated, and followed, these principles (except for the defendant's presence at the sidebar conference),

and he properly concluded that the conduct of the defendant's trial counsel fell within the range of reasonable professional response to anticipated client perjury and thus satisfied both rule 3.3 (e), and constitutional concerns. See J.W. Hall, Jr., Professional Responsibility of the Criminal Lawyer §§ 26:10-26:14 (2d ed. 1996).

3. We reject the defendant's contention that the judge erroneously denied his motion to dismiss the indictments on the ground that the Commonwealth lost potentially exculpatory evidence, namely, blood evidence on scissors recovered at the murder scene. Twelve days after the killings, a Fall River detective found a pair of scissors under the couch on which Allen's body had earlier been discovered. Half-way down one side of the exterior of the closed scissors, the detective saw two small brown spots, each the approximate size of a pin head. He scraped off the substances into a small envelope, sealed it, and turned it over to a State trooper who sent the envelope to the State crime laboratory. There, a technician opened the envelope, observed the contents, and resealed the envelope. In response to a defense motion, the technician sent the envelope to Cellmark Diagnostics, an independent laboratory. A DNA analyst from Cellmark Diagnostics opened the envelope and found nothing.

The judge employed the correct balancing test to assess the problem. See *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). Under that test, "when potentially exculpatory evidence is lost or destroyed . . . [t]he courts must weigh the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant." *Id.* The judge expressly found "that there was no bad faith or negligence on the part of the agents of the [g]overnment." He also noted that, even if testing the substance on the scissors revealed that the defendant was not the donor of the substance, the evidence in the case was that a knife, and not scissors, had inflicted the victims' stab wounds. The judge concluded that there was no potential prejudice to the defendant from the loss of the substance on the scissors. As a remedy, the judge permitted the defendant's trial counsel to argue to the jury that the police's inexcusable loss of evidence could raise a reasonable doubt as to the defendant's guilt. The defendant's trial counsel made this argument to the

jury in his summation. The record supports the judge's findings. We discern no clear abuse of discretion in the judge's handling of the issue or the remedy he fashioned. See *Commonwealth* v. *Harwood*, 432 Mass. 290, 302 (2000), and cases cited. The motion to dismiss was properly denied.

4. The judge properly rejected the defendant's remaining claims of ineffective assistance of counsel based on the defendant's trial counsel's alleged (1) failure to interview certain witnesses; (2) failure to object to commentary on Tatiana's credibility by a State trooper and failure to offer her "exculpatory" statements; and (3) failure to object when the prosecutor argued that a witness, Tonya Oliver, had identified the defendant. The judge correctly concluded that, based on the inconsistencies in the accounts of the victims' children, the implausibility of statements made by them, and their eventual admissions that they had been sleeping when their parents had been killed, it was questionable whether the girls would have been found competent to testify, and "it would have been reasonable for [trial] counsel to conclude that [Tatiana's] identification of the killers was not credible and would not be viewed by a jury as credible." The judge also correctly concluded that trial counsel's failure to interview other potential witnesses did not deprive the defendant of an otherwise available, substantial ground of defense. No substantial likelihood of a miscarriage of justice resulted from any failure to interview these witnesses. See *Commonwealth* v. *Knight*, 437 Mass. 487, 499 (2002).

The defendant's other grounds for claiming ineffective assistance of counsel lack support in the record. The State trooper who interviewed Tatiana, contrary to the defendant's contention, did not comment on her credibility, but rather pointed out that she had changed her story several times. All accounts were brought out in the evidence. Finally, the prosecutor did not improperly argue that Oliver had identified the defendant, but rather only that she saw an "individual" around the same time that Adams saw the defendant approach the porch to his apartment building.[8] Trial counsel was not ineffective in failing to object to this argument.

---

[8]The defendant's trial counsel's failure to object to Oliver's testimony was not ineffective because her testimony concerning the description of a man she

5. The judge properly denied the defendant's postconviction motion for funds sought to hire an investigator to interview "exculpatory witnesses," including the victims' children, Tonya Oliver, people interviewed by police, and a friend of the defendant. The defendant contended that, without the interviews, he could not provide factual support for the claim that his trial counsel was ineffective. The judge concluded that the defendant was unable to "present a meritorious ground for a new trial," and denied the motion.

The applicable rule, Mass. R. Crim. P. 30 (c) (4) and (5), as appearing in 435 Mass. 1502 (2001), and as explained by the Reporter's Notes to Mass. R. Crim. P. 30 (c) (5), 43D Mass. Gen. Laws Ann. at 393 (West 2002) gives judges "discretion to allow for the payment of costs associated with the preparation and presentation of a new trial motion. Such costs may include . . . obtaining the services of an investigator . . . . As with the decision to appoint counsel, there is no constitutional right to have the [S]tate pay for these types of costs associated with a new trial motion. . . . In making the decision to allow costs associated with a new trial motion, the judge should take into account the likelihood that the expenditure will result in the defendant's being able to present a meritorious ground for a new trial." The record supports the judge's conclusion that the defendant failed to "present a meritorious ground for a new trial." The judge applied the correct standard, considered the expected testimony of the "exculpatory witnesses," and correctly concluded that the exculpatory aspects of testimony expected from these witnesses either had been brought to the attention of the jury in some manner or would not have accomplished anything material for the defense.

6. We have examined the record pursuant to our obligation under G. L. c. 278, § 33E. There is no basis to grant the defendant relief.

7. We affirm the judgments of conviction and the orders denying the motion for a new trial and the motion for funds.

*So ordered.*

saw near the crime scene about the time of the crimes was relevant and admissible.