******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., with whom ZARELLA and ROBINSON, Js., join, dissenting. The majority concludes that a criminal defendant who insists on taking the stand to testify in his own defense, but who refuses to cooperate or even to speak with his assigned counsel so that they can prepare him for examination, is deprived of his sixth amendment right to counsel if the trial court concludes that the only way to accommodate his conflicting demands is to require that he testify in narrative form, with his public defenders temporarily assisting as "standby counsel." I disagree that this reasonable solution to a conundrum entirely of the defendant's own making amounts to a constitutional violation. Accordingly, I respectfully dissent, and would affirm the judgment of the Appellate Court.

I

THE DEFENDANT WAS NOT DENIED THE
RIGHT TO COUNSEL

I first conclude that the defendant, Maurice Francis, was not denied the right to counsel when making his brief narrative statement. The following facts are relevant to the disposition of this claim. It is undisputed that defense counsel, Bruce Lorenzen and William O'Connor, actively and adequately represented the defendant throughout the pretrial process and during the state's presentation of its case. After the state rested, counsel continued to put on a vigorous defense. Prior to calling the defendant, counsel called and questioned four witnesses: Noel Hernandez, a neighbor of the defendant at the time of the murder of the victim, Tashima Reddick; Brenton Alexander, a former neighbor and friend of the defendant who had dated the defendant's mother; and Sachin Parekh and Douglas McAdoo, two physicians in the emergency department of an area hospital who treated the victim in the months prior to her murder. When the defendant then opted to proceed with his plan to testify, defense counsel questioned him at some length, asking him twenty-seven questions prior to inviting his narrative statement. Although the Appellate Court characterized these questions as merely "preliminary"; *State* v. *Francis*, 148 Conn. App. 788, 811, 86 A.3d 1074 (2014); in fact, most of the direct examination was comprised of substantive questions calculated to afford the defendant an opportunity to develop the two theories of the case that he attempted to articulate throughout the trial: (1) that he was incarcerated at the time of the murder and, therefore, he could not have committed it; and (2) that the case was one of mistaken identity, in which the proper defendant was an alleged half brother of the defendant with the nearly identical name of *Mourice* Francis. For example, defense counsel questioned the defendant as to: whether he was the

speaker on a 911 tape reporting the victim's death (he claimed not to be); whether he had been incarcerated at the time of the murder (he claimed to have been); whether he knew the victim or had any knowledge of the events surrounding her death (he denied any knowledge thereof); and the nature of his relationship to other members of the Francis family (he claimed that his mother's name was Pam and that Viola Francis, the woman who claimed to be his mother, was, in fact, the mother of the purported half brother, Mourice). Defense counsel also attempted to question the defendant regarding medications that he had been prescribed while incarcerated, presumably in an effort to raise doubts as to his mental competence, but the court sustained the state's objection to that line of inquiry. Accordingly, although the dozens of questions that counsel asked the defendant on direct examination may have been preliminary in the limited sense that they preceded his narrative testimony, they sought to develop a substantive defense and to elicit the defendant's theory of the case, and did not merely set the table for the brief narrative statement that followed.

After the defendant gave his narrative statement, defense counsel was available on what the court characterized as a "standby" basis to object to the state's brief cross-examination. No objection was warranted, however, as the prosecutor did not attempt to exceed the scope of direct examination, and merely questioned the defendant about his knowledge of the victim, his relationship to Viola Francis, and his involvement in the events surrounding the victim's murder. There was no redirect examination.

Following the defendant's testimony, defense counsel resumed their traditional role. They called Viola Francis as a sixth defense witness and, once again, attempted to verify the defendant's story that he had been mistaken for a half brother named Mourice. The defense team subsequently cross-examined the state's rebuttal witnesses, sought favorable jury instructions, renewed their request that the court order a competency evaluation of the defendant, and presented a vigorous and substantial closing argument.

It is clear, then, that the only portion of the trial during which defense counsel was not engaged in fully and actively representing the defendant was the brief period when he presented his narrative statement, a statement that is largely incoherent and spans only eighteen lines of transcript. Defense counsel invited this narrative statement, following his direct examination of the defendant, by asking him: "Is there anything else you'd like to tell the ladies and gentlemen of the jury about this case?" The defendant responded: "Well, I have some notes that I've been documenting about what I've been acknowledging, that's about that. Is it fair that I state that?" After the court offered him the choice

whether to proceed, the defendant stated, "I'll proceed," and then, following a brief interruption by the court, made the following statement: "Due to today's session, I have acknowledged that my whereabouts would contradict any charges that would be brought against me, and I acknowledge today also that the state of Connecticut and . . . Lorenzen and . . . O'Connor is attempting to slave, gamble, and incompetent to commit by probate without a cause to embezzle due to the fact that this matter does not have a cause of death.

"And I also have some other notes, that I'm not booked or arraigned and my identity has been gambled by Major Crimes Division also at the same time—and also by an attorney by the name of Cynthia I. Crockett gambled my name by settling a claim in my little brother's name, Maurice Francis, and that's fiber optic. On November 16, 80 Washington Street, which can also be subpoenaed too and sent in for permanencies. I am legally disabled."[1] When asked if he wished to add anything further, the defendant responded, "No, ma'am."

Although neither this court nor the United States Supreme Court has spoken directly to the issue, a number of our sister courts have concluded that the sixth amendment right to counsel is not infringed when a criminal defendant makes this sort of brief narrative statement to the jury, unmediated by counsel, but otherwise enjoys the benefit of full legal representation throughout the trial process. See, e.g., *Feole* v. *Wall*, Docket No. C.A. 02-518S, 2004 WL 350036, *8–9 (D.R.I. February 23, 2004) (when defense counsel provided able representation throughout entire trial but was unprepared and unwilling to examine defendant, reviewing court found no violation of right to counsel in trial court's granting of defendant's eleventh hour request to testify, conditioned on his testifying unassisted, in narrative form); *People* v. *Nakahara*, 30 Cal. 4th 705, 717–18, 68 P.3d 1190, 134 Cal. Rptr. 2d 223 (2003) (trial court was not required to obtain defendant's express waiver of right to counsel when defendant had assistance of counsel at all stages of trial except during narrative statement, in which counsel was unable to assist); cf. *People* v. *Guzman*, 45 Cal. 3d 915, 946, 755 P.2d 917, 248 Cal. Rptr. 467 (1988) (where defendant was " 'forced' " to represent himself only with respect to his own direct testimony and counsel was available for and participated in all other stages of trial, it was not necessary that trial court's warnings about dangers of self-representation be as complete), cert. denied, 488 U.S. 1050, 109 S. Ct. 882, 102 L. Ed. 2d 1005 (1989), overruled in part on other grounds by *Price* v. *Superior Court*, 25 Cal. 4th 1046, 25 P.3d 618, 108 Cal. Rptr. 2d 409 (2001).[2]

The rationale underlying those decisions is compelling. Narrative testimony is, by definition, a form of testimony in which "defendants testify without ques-

tioning by counsel . . . ." L. Perrin, "The Perplexing Problem of Client Perjury," 76 Fordham L. Rev. 1707, 1737 (2007). To the extent that narrative testimony is appropriate in a given situation, then, the fact that defense counsel merely asks an open-ended question inviting the narrative response, and then permits the defendant to answer, does not deprive the defendant of legal representation, any more than a defendant is unrepresented during other stages of the trial during which counsel plays a more passive role. There is, quite simply, nothing else for defense counsel to do during that portion of the trial.

In the present case, although the majority apparently believes that the use of the narrative format was inappropriate, it never tells us exactly what the alternative might have been. This was a case in which the defendant refused to meet or even to speak with his defense team. He specifically refused counsel's offer to help him prepare to testify. In addition, the defendant's beliefs and theories went well beyond the implausible and the far-fetched. His statements, both to the court and to the jury, were frequently incoherent. He repeatedly claimed, for example, that his identity and his alibi could be established via "fiber optic" or "fiber optic audio," and his narrative testimony was a rambling diatribe in which he accused various attorneys of attempting to "gamble" and "slave" him, and of "commit[ting] by probate without a cause to embezzle . . . ." Under those circumstances, I do not believe that defense counsel, having made a valiant effort to elicit the defendant's bizarre beliefs through direct questioning, could have provided any further assistance beyond what they in fact did: inviting him to tell the jury anything else he wished to about the case.

To be clear, my view is not that the defendant was deprived of his right to counsel and that that deprivation amounted to harmless error, but, rather, that the defendant never was deprived of his right to counsel. There was, quite simply, nothing more that the defendant's attorneys—or any other attorneys who might have replaced them—could have done to represent him effectively while still allowing him to speak his piece.

In support of its conclusion that the defendant was deprived of legal representation during his narrative testimony, the majority argues, first, that "defense counsel understood the defendant to be self-represented during his testimony," and, second, that defense counsel "made it abundantly clear that they had no intention of representing the defendant should he testify and would file a motion to withdraw if necessary to avoid doing so."[3] I disagree with the majority's characterization of the record in both respects. A more accurate characterization of the record is that defense counsel never actually stated that they believed the defendant to be self-represented, nor did they ever threaten to

withdraw if the defendant testified.

With respect to counsel's understanding of the defendant's status, the majority relies entirely on statements made by Lorenzen, statements in which Lorenzen repeatedly and carefully qualified any allusions to self-representation. The issue arose when the court, in response to the defendant's frequent outbursts, informed the defendant that, if he wished to make a statement, he would have to take the stand, testify under oath and be subject to cross-examination. Lorenzen responded: "I understand. But at this point, to the extent he does choose to take the stand, I would have to take the position that he is doing so *uncounseled* and in *essentially* in a manner in which he's representing himself." (Emphasis added.) Revisiting the issue at the close of the state's case, Lorenzen again represented to the court that, in light of the defendant's complete refusal to cooperate in preparing for his testimony, "should [the defendant] take the stand and testify, he will *essentially* be representing himself." (Emphasis added.) Lorenzen then elaborated: "I don't see how I can *effectively* . . . examine [the defendant] directly. I don't believe I have the ability to *effectively* do that and meet his ends and that's why I would assert and I believe he should be canvassed on representing himself." (Emphasis added.) In other words, although Lorenzen, out of an abundance of caution, framed his request to the court in terms of canvassing the defendant on self-representation, it is clear in context that his primary concern was merely to ensure that both the court and the defendant understood that the defendant was setting forth on a perilous path—one in which he would exercise his right to testify on his own behalf, and thereby risk incriminating himself, without the benefit of *informed* legal advice, preparation, and assistance. I am aware of no authority for the proposition that a criminal defendant who is assisted by counsel, but who *essentially* represents himself insofar as he refuses to cooperate with counsel in preparing for his direct examination, is thereby deprived of his sixth amendment rights.

With respect to counsel's alleged threat to withdraw if the defendant insisted on testifying, I disagree with the majority's characterization of the record. The only facts of relevance arise from the following colloquy, which transpired at the close of the state's case, when defense counsel informed the court that the defendant, who wished to testify, believed that defense counsel was "working against him":

"The Court: [The defendant] hasn't waived counsel.

"[Defense Counsel]: He has not, but—

"The Court: [The defendant] has the waiver, not you. Are you withdrawing?

"[Defense Counsel]: Judge, I don't see how I can effectively—it would fall to me—based on . . . O'Con-

nor's and [my] discussion it fall[s] to me to examine [the defendant] directly. I don't believe I have the ability to effectively do that and meet his ends and that's why I would assert and I believe he should [be] canvassed on representing himself.

"The Court: You're not withdrawing, correct? You're not filing a motion to withdraw?

"[Defense Counsel]: He's—Judge, he's not asked me to. If we need to—if we need to do that to flush out the issue—because I think that's really the issue about him representing himself here. Because—

"The Court: You haven't filed one?

"[Defense Counsel]: I have not filed one, but I will if that's what I need to do."

I see nothing in this colloquy to support the majority's conclusion that "[d]efense counsel made it abundantly clear that they had no intention of representing the defendant should he testify and would file a motion to withdraw if necessary to avoid doing so." Rather, it was the court that repeatedly raised the question of withdrawal. Lorenzen thrice declined to state that he intended to withdraw. Instead, he merely offered to do so if the court thought it necessary to "flush out" the issue. Nor is there any evidence in the record that his cocounsel, O'Connor, ever threatened to withdraw if the defendant were to testify.[4]

I further note that, when it came time for the defendant to give his narrative statement, the court inquired whether Lorenzen wished to remain seated. Lorenzen responded: "I guess it would work best if I did not." The fact that defense counsel stood throughout the defendant's testimony strongly suggests that counsel did not understand the defendant to be unrepresented during that time, and did not wish to give the jury such an impression. Accordingly, I reject the majority's conclusion that defense counsel understood the defendant to be self-represented during his narrative testimony.

With respect to the trial court's perspective, I concede that the trial court canvassed the defendant on self-representation, indicated to the defendant that he would be representing himself during his testimony, and identified Lorenzen as "standby counsel" for the purposes of the defendant's testimony, and that the docket sheet notates these actions. It is well established, however, that, in hybrid representation arrangements such as the one that the court imposed here, the use of labels such as "self-represented" and "standby counsel" is not dispositive for sixth amendment purposes. Rather, when a criminal defendant participates in his own defense, but counsel remains available to assist at all times, the fact that the court has labeled the defendant as self-represented does not necessarily indicate that he has been deprived of legal representa-

tion.[5] See, e.g., *Commonwealth* v. *Maynard*, 2 Mass. App. 894, 319 N.E.2d 453 (1974); *Phillips* v. *State*, 604 S.W.2d 904, 908 (Tex. Crim. App. 1979); see also *United States* v. *Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997) (envisioning "a case where standby counsel held that title in name only and, in fact, acted as the defendant's lawyer throughout the proceedings"); cf. *State* v. *Layton*, 189 W. Va. 470, 477, 432 S.E.2d 740 (1993) ("courts have . . . recognized that there is a substantial difference between the colloquy which must be conducted . . . when a defendant elects to proceed wholly pro se as opposed to when he proceeds pro se with counsel").

Moreover, in situations where defense counsel believes that a defendant intends to give false or perjurious testimony, it frequently has been held that requiring a criminal defendant to present his account of events in narrative form, without the assistance of counsel, does not deprive him of the right to counsel. "Courts considering the constitutional implications of a defendant's narrative testimony have overwhelmingly concluded that requiring the defendant to testify in narrative form strikes an appropriate balance between preserving the defendant's right to testify on his own behalf and his right to counsel and counsel's ethical obligation to the court, and does not deprive the defendant of effective assistance of counsel so long as the defendant is otherwise vigorously defended." *Commonwealth* v. *Mitchell*, Docket No. CRIM. A. 9673CR0312, 2000 WL 33119695, *25 (Mass. Super. December 18, 2000), aff'd, 438 Mass. 535, 781 N.E.2d 1237, cert. denied, 539 U.S. 907, 123 S. Ct. 2253, 156 L. Ed. 2d 118 (2003); id. (listing relevant cases). The record does not reveal exactly why defense counsel in the present case sought to distance themselves from the defendant's proposed testimony. Although defense counsel apparently was of the belief that the defendant's views were "sincere," and thus that perjury per se was not a consideration, counsel was nevertheless convinced that "[t]he things that [the defendant] is so vehemently expressing do not comport [with] the reality that the rest of us see." It is unclear, however, whether counsel's primary concern was that participating more directly in eliciting the defendant's account of the events in question could have run afoul of rule 3.3 (a) (3) of the Rules of Professional Conduct,[6] or simply that the defendant's weird and outrageous views were tangential to his defense and would not have portrayed him favorably before the jury. In either case, I conclude that it was appropriate for the trial court to require the defendant to testify in narrative form, and that, by so doing, the court did not infringe his sixth amendment right to counsel.

## II

THE DEFENDANT WAIVED HIS RIGHT TO COUNSEL

Even if the defendant did not have legal representation during his narrative, I would conclude, contrary to

the majority, that he waived his sixth amendment right to counsel. Specifically, I conclude that the defendant, by insisting on taking the stand but refusing to collaborate or cooperate with his defense counsel, waived his right to the assistance of counsel with respect to that portion of the trial.

On more than one occasion, Lorenzen informed the court that the defendant's choices had placed defense counsel in a predicament. Specifically, the defendant insisted on testifying in his own defense, but he refused to meet or speak with defense counsel so that they could prepare him for questioning. Without such preparation and collaboration, it would be impossible for them to directly examine him with any effectiveness. That was especially so in the present case, where the defendant's beliefs and theories about the case were so facially bizarre that his counsel could not reasonably hope to conduct a meaningful examination thereon without first having an opportunity to discuss them with the defendant.

Faced with similar circumstances, other courts have concluded that, to the extent that a criminal defendant refuses to cooperate with counsel, he implicitly waives his sixth amendment right to legal assistance. See, e.g., *United States* v. *Scotton*, Docket No. I2-60049-CR, 2013 WL 10154297, *2 (S.D. Fla. July 26, 2013) ("[d]efendant's refusal to cooperate with counsel constitutes a voluntary and knowing waiver of counsel"); *People* v. *Vaughn*, 116 Ill. App. 3d 193, 197, 451 N.E.2d 898 (1983) (court properly required uncooperative defendant to proceed pro se with standby counsel); *People* v. *Kammeraad*, 307 Mich. App. 98, 126–27, 858 N.W.2d 490 (2014) (concluding that wholly uncooperative defendant "received exactly what he desired" and refusing "to reward [him] with a new trial on the basis of an alleged constitutional deficiency that was of [his] own making"); cf. *Thomas* v. *Wainwright*, 767 F.2d 738, 743 (11th Cir. 1985) ("[a] criminal defendant's unreasonable refusal to communicate or cooperate with his attorney is one of the 'circumstances' that must be considered in determining whether an attorney's assistance was reasonably effective"). For this reason, I agree with the state that the defendant, who was permitted to do exactly what he wanted—to exercise his fundamental right to testify without accepting his counsel's assistance or advice—cannot now be heard to complain that his right to counsel was infringed thereby.

Indeed, the majority does not dispute that most of the criteria for a valid *express* waiver of counsel were satisfied here. The trial court: (1) canvassed the defendant as to his desire to represent himself; (2) repeatedly informed the defendant that he had the right to an attorney; (3) informed the defendant of the risks he would be taking in waiving the right to counsel; and (4) established that the defendant knowingly agreed to

represent himself. The majority merely contends that this choice to proceed pro se was not freely made, but was, instead, a " 'Hobson's choice' " in which the defendant improperly was forced to select between exercising two fundamental rights. It is well established, however, that the fact that a criminal defendant does not initiate the request to represent himself, and even the fact that he agrees to represent himself as the lesser of two evils, does not in itself vitiate an otherwise valid canvass. Numerous courts have held that when a defendant refuses the assistance of the public defender assigned to represent him, his sixth amendment rights are not violated if the court, sua sponte, forces him to choose between accepting the unwanted assigned counsel or representing himself. See, e.g., *German* v. *State*, 268 Ind. 67, 71, 373 N.E.2d 880 (1978); *People* v. *Longuemire*, 77 Mich. App. 17, 22–23, 257 N.W.2d 273 (1977); *Gallego* v. *State*, 117 Nev. 348, 359, 23 P.3d 227 (2001), overruled in part on other grounds by *Nunnery* v. *State*, 263 P.3d 235, 253 n.12 (2011), cert. denied, U.S. , 132 S. Ct. 2774, 183 L. Ed. 2d 643 (2012); *State* v. *Linsky*, 117 N.H. 866, 880, 379 A.2d 813 (1977). Here, by the same token, while representing himself may not have been the defendant's first choice, his absolute refusal to cooperate with the public defenders assigned to represent him meant that self-representation was his only viable alternative. Although the majority suggests that the trial court could have appointed substitute counsel, the court was under no obligation to do so because defense counsel had not withdrawn from the case. See generally *State* v. *Jordan*, 305 Conn. 1, 35, 44 A.3d 794 (2012) (*Palmer, J.*, concurring). Ultimately, then, it is the majority's holding that will force a trial court to make a Hobson's choice. For these reasons, I would affirm the judgment of the Appellate Court.

Accordingly, I respectfully dissent.

[1] Attorneys Lorenzen and O'Connor were the defendant's trial counsel of record. We are not aware of any participation by Attorney Crockett in the present case. It also is unclear whether his "little brother's name" was properly transcribed as "Maurice," or, rather, whether the defendant intended to refer to the previously mentioned "Mourice."

[2] The central question raised by this appeal is under what circumstances a defendant who testifies briefly in the narrative form, but otherwise is assisted by counsel throughout his trial, can be said to be self-represented for sixth amendment purposes. I find it striking that the majority, which fails to cite so much as a single case addressing this question, dismisses this highly probative case law as "inapplicable" without any discussion or analysis.

[3] The majority also contends that the defendant must have been self-represented because he had full control over the presentation of his case. I fail to understand how the fact that the defendant complied with the requirements imposed by the trial court, and gave his brief, two paragraph statement in narrative form, *after being invited to do so by his attorney*, suggests in any way that he was in control of the presentation of his case. The United States Supreme Court has indicated that control over one's case, for the purposes of assessing self-representation, encompasses factors such as making significant tactical decisions, controlling the questioning of witnesses, and speaking instead of counsel on matters of importance. *McKaskle* v. *Wiggins*, 465 U.S. 168, 178, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984). Beyond the mere fact that the defendant exercised his right to testify, a choice that

in no way implicates self-representation, none of that happened here.

[4] I find it noteworthy that the majority, which suggests without any explanation that I have "tak[en] a view of the record that differs from that of the trial court"; see footnote 5 of the majority opinion; declines to quote Lorenzen's actual colloquy with the court or, indeed, to provide any support for its conclusion that "[d]efense counsel made it abundantly clear that they had no intention of representing the defendant should he testify . . . ."

[5] One reason this is true is that labels such as "standby" and "advisory" counsel are used inconsistently, and may be applied to a broad spectrum of arrangements in which defense counsel serves the defendant in a range of capacities, up to and including acting as full cocounsel. See *State* v. *Powers*, 211 W. Va. 116, 122, 563 S.E.2d 781 (2001) ("t]he cases have loosely used such terms as . . . advisory counsel, standby counsel, and hybrid representation to describe a multitude of situations in which both the accused and professional counsel are involved in the presentation of the defense case" [internal quotation marks omitted]). In the present case, for example, the "standby" role that the trial court established for Lorenzen, which extended to filing objections to the state's cross-examination, appears to exceed that envisioned by our rules of practice. See Practice Book § 44-5 ("If requested to do so by the defendant, the standby counsel shall advise the defendant as to legal and procedural matters. If there is no objection by the defendant, such counsel may also call the judicial authority's attention to matters favorable to the defendant. *Such counsel shall not interfere with the defendant's presentation of the case and may give advice only upon request.*" [Emphasis added.]).

[6] Rule 3.3 (a) (3) of the Rules of Professional Conduct provides in relevant part that "[a] lawyer shall not knowingly . . . [o]ffer evidence that the lawyer knows to be false. . . ."