[No. S018292. May 22, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
EVAN TEEK NAKAHARA, Defendant and Appellant.

## COUNSEL

Lynne S. Coffin, State Public Defender, under appointment by the Supreme Court, Peter R. Silten and Arnold Erickson, Deputy State Public Defenders, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Carol Wendelin Pollack and Pamela C. Hamanaka, Assistant Attorneys General, Donald Denicola, Robert S. Henry, Keith H. Borjon, John R. Gorey and Shawn McGahey Webb, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CHIN, J.**—Defendant Evan Teek Nakahara appeals from a judgment of the Los Angeles County Superior Court imposing the death penalty following his conviction of first degree murder (Pen. Code, § 187),[1] burglary (§ 459), and robbery (§ 211), accompanied by special circumstance findings that he committed the murder while lying in wait (§ 190.2, subd. (a)(15)), and while engaged in the commission of burglary (*id.*, former subd. (a)(17)(i)) and robbery (*id.*, former subd. (a)(17)(vii)). The jury also found defendant used a firearm (§§ 1203.06, 12022.5) but was not personally armed (§ 12022) during these crimes. Defendant's appeal is automatic. (§ 1239, subd. (b).) As will appear, we will affirm the judgment in its entirety.

### I. FACTS

Defendant and Michael Rojas were jointly charged with murdering Beatrice Viveiros on July 11, 1989. The trial court ordered the cases severed for trial. The evidence in the present case showed that defendant had been dating Viveiros for several years, and had admired a gun collection owned by her father. Defendant had earlier joked with his friend Edwin Skinner about planning to steal the guns and "doing away" with Viveiros after the

---

[1]All further statutory references are to the Penal Code.

theft. On the day of the murder, defendant and Rojas visited Viveiros's house around 1:15 p.m. and defendant asked her to help him back his car into the garage and empty his car trunk. After the job was done, Viveiros closed the garage door on his car, angering him.

According to Viveiros's friend Kim Austin, when Austin left at 2:45 p.m., Viveiros was alive and in the company of defendant and Rojas. Viveiros's father arrived at the house around 4:30 p.m. and found his daughter's lifeless body on a hallway floor. His guns were missing, along with various war memorabilia such as pins, certificates and war ration cards. Viveiros had been shot three times in the back and once beneath her left ear; each wound probably would have been fatal.

On the same day, around 3:34 p.m., defendant asked a friend's sister, Debra Helm, if her brother would be interested in buying some guns, and she said "no." Later, between 5:00 and 6:00 p.m., defendant called his friend Steven Jurich and asked if he knew anyone who wanted to buy a gold-plated Winchester rifle. Jurich, not knowing of Viveiros's death, told defendant he knew no one who might be interested. Around the same time, John Calvert arrived at defendant's house. Defendant showed him the guns and admitted shooting a girl three times at point-blank range. Defendant also told Calvert that Rojas shot her one time. Thereafter, defendant approached his uncle, Todd Kawabata and sold him some of the war memorabilia he had taken. Defendant also visited his friend Mitch Zankich and offered to sell him some guns, but Zankich declined the offer.

Investigating officers went to defendant's apartment and discovered a large collection of weapons later identified as belonging to Viveiros's father. Defendant and Calvert were arrested and placed in custody. Defendant, after first denying involvement, eventually told interrogating officers that he shot Viveiros following a quarrel over some bad checks she had deposited to his account. Defendant admitted taking the guns to make the shooting appear to be motivated by robbery.

At the penalty phase, the prosecution introduced evidence that in October 1989, prison guards found a 12-inch metal shank concealed in defendant's cell. The defense offered various background and character witnesses including a cultural anthropologist, defendant's parents, and his uncle. This evidence tended to show that defendant had a difficult childhood, and was raised by a passive, nonnurturing father and an overly strict mother, resulting in defendant's depression and aggressive personality. Defendant himself testified (against advice of his counsel), cautioning the jury that persons serving life terms often get into more trouble, and telling them he would

choose the death penalty if the decision were up to him. He explained on cross-examination that he sought a death penalty because he was "worn out" with the court proceedings.

## II. GUILT PHASE ISSUES

### A. *Murder Instructions*

■ The information charged defendant with premeditated and deliberate murder under section 187, subdivision (a). At the close of the guilt phase, the jury was instructed on premeditated murder, felony murder, and murder by lying in wait. Defendant faults the instructions for their failure to require *unanimous* agreement, beyond a reasonable doubt, as to which of these theories the jury accepted. According to defendant, the omission denied him due process, a verdict rendered beyond a reasonable doubt, and a reliable guilt determination under the state and federal Constitutions. We discern no error.

■ Defendant, citing language in *People v. Dillon* (1983) 34 Cal.3d 441, 479, footnote 26 [194 Cal.Rptr. 390, 668 P.2d 697] (plur. opn. of Mosk, J.), finds "confusing" our prior decisions regarding the relationship between premeditated murder and felony murder. But our recent cases have clarified any confusion, holding that although the two forms of murder have different elements, only a single statutory offense of murder exists. Felony murder and premeditated murder are not distinct crimes, and need not be separately pleaded. (E.g., *People v. Hughes* (2002) 27 Cal.4th 287, 369 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Kipp* (2001) 26 Cal.4th 1100, 1131 [113 Cal.Rptr.2d 27, 33 P.3d 450]; *People v. Silva* (2001) 25 Cal.4th 345, 367 [106 Cal.Rptr.2d 93, 21 P.3d 769]; *People v. Carpenter* (1997) 15 Cal.4th 312, 394-395 [63 Cal.Rptr.2d 1, 935 P.2d 708].) ■ As for defendant's claim that a unanimity instruction should have been given, our cases have repeatedly rejected this contention, holding that the jurors need not unanimously agree on a theory of first degree murder as either felony murder or murder with premeditation and deliberation. (E.g., *Kipp, supra,* 26 Cal.4th at p. 1132; *People v. Lewis* (2001) 25 Cal.4th 610, 654 [106 Cal.Rptr.2d 629, 22 P.3d 392]; *People v. Box* (2000) 23 Cal.4th 1153, 1212 [99 Cal.Rptr.2d 69, 5 P.3d 130]; *People v. Riel* (2000) 22 Cal.4th 1153, 1200 [96 Cal.Rptr.2d 1, 998 P.2d 969].)

We are not persuaded otherwise by *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435]. There, the United States Supreme Court found a constitutional requirement that any *fact* that increases the maximum penalty for a crime, other than a prior conviction, must

be formally charged, submitted to the fact finder, treated as a criminal element, and proved beyond a reasonable doubt. (*Id.* at pp. 476-490 [120 S.Ct. at pp. 2355-2363].) We see nothing in *Apprendi* that would require a unanimous jury verdict as to the particular *theory* justifying a finding of first degree murder. (See also *Ring v. Arizona* (2002) 536 U.S. 584, 610 [122 S.Ct. 2428, 2443-2444, 153 L.Ed.2d 556] [requiring jury finding beyond reasonable doubt as to *facts* essential to punishment].)

### B. *Consciousness of Guilt Instruction*

Evidence at trial showed that during his interrogation defendant initially denied complicity in the Viveiros offenses. The court instructed the jury that it could consider any false statements made by defendant as evidence of his consciousness of his guilt of the charged offenses, although such conduct alone is insufficient to prove guilt, and its weight and significance, if any, are matters for the jury. (See CALJIC No. 2.03.) Defendant now contends the instruction was impermissibly argumentative and improperly allowed the jury to make irrational inferences regarding his mental state during the commission of the offenses.

As defendant acknowledges, we have rejected similar arguments in prior cases. (*People v. Kipp* (1998) 18 Cal.4th 349, 375 [75 Cal.Rptr.2d 716, 956 P.2d 1169], and cases cited; *People v. Jackson* (1996) 13 Cal.4th 1164, 1223-1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1140-1141 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People v. Bacigalupo* (1991) 1 Cal.4th 103, 128 [2 Cal.Rptr.2d 335, 820 P.2d 559].) We see no reason to reconsider the soundness of these decisions. Defendant relies on *People v. Mincey* (1992) 2 Cal.4th 408 [6 Cal.Rptr.2d 822, 827 P.2d 388], but that case is inapposite for it involved no consciousness of guilt instruction but merely deemed improper and unduly argumentative a proposed defense instruction that would have invited the jury to "infer the existence of [the defendant's] version of the facts, rather than his theory of defense." (*Id.* at p. 437.)

### C. *Reasonable Doubt and Related Instructions*

Defendant finds asserted defects in various instructions outlining the People's burden of proof. These claims lack merit.

The court gave several related instructions (CALJIC Nos. 2.01, 2.02, and 8.83) essentially telling the jurors they had a duty to accept the reasonable interpretation of evidence and reject the unreasonable interpretation. Defendant asserts that these instructions were contrary to the basic "beyond a

reasonable doubt" principle and enabled the jurors to find him guilty "if he reasonably appeared guilty," regardless of any reasonable doubt they might entertain. Defendant characterizes these instructions as creating "an impermissible mandatory conclusive presumption of guilt," in cases in which a reasonable interpretation of evidence points toward guilt. Defendant believes these instructions "had the effect of reversing the burden of proof," requiring the jury to find him guilty unless he came forward with reasonable evidence of his innocence.

As the Attorney General correctly observes, we have recently rejected these contentions, and we see no reason to reconsider them. (*People v. Riel, supra,* 22 Cal.4th at p. 1200; *People v. Millwee* (1998) 18 Cal.4th 96, 160 [74 Cal.Rptr.2d 418, 954 P.2d 990]; *People v. Crittenden* (1994) 9 Cal.4th 83, 144 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

Defendant also suggests that other instructions (CALJIC Nos. 1.00 [defendant's arrest and prosecution not used to infer he is "more likely to be guilty than not guilty"] and 2.51 [presence of motive may establish guilt]) misled the jury by failing to reiterate that the central issue in the case was not simply guilt or innocence, but whether guilt had been demonstrated beyond a reasonable doubt. Again, we have recently rejected the argument. (*People v. Frye* (1998) 18 Cal.4th 894, 957-958 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

Defendant argues that another instruction (CALJIC No. 2.21.2) "impermissibly lightened" the People's proof burden by telling the jury it should distrust, and could reject, the entire testimony of a witness who has given willfully false material testimony, unless the jury believes that "the probability of truth" favors the testimony. Defendant contends this instruction "allowed the jury to assess prosecution witnesses by seeking only a probability of truth in their testimony." But as we have held, the targeted instruction says no such thing. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 493 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *People v. Riel, supra,* 22 Cal.4th at p. 1200.)

▮ Defendant complains of an instruction (CALJIC No. 2.22) advising the jurors to evaluate the evidence by looking at its "convincing force" rather than the "relative number" of testifying witnesses. Defendant argues that the instruction improperly "replaced" the beyond reasonable doubt standard with a standard akin to a preponderance of evidence standard. Although we have not considered the point, we adopt the reasoning of Court of Appeal cases holding that CALJIC No. 2.22 is appropriate and unobjectionable when, as here, it is accompanied by the usual instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof (see CALJIC No. 2.90). (*People v. Clay* (1984) 153 Cal.App.3d 433, 461-462 [200

Cal.Rptr. 269]; *People v. Salas* (1975) 51 Cal.App.3d 151, 155-157 [123 Cal.Rptr. 903].)

 Finally, defendant challenges an instruction (CALJIC No. 8.20) advising the jury that premeditation and deliberation "must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition *precluding* the idea of deliberation . . . ." (Italics added.) Defendant suggests that the word "precluding" is too strong and could be interpreted as requiring him to absolutely preclude the possibility of deliberation, as opposed to merely raising a reasonable doubt on that issue. We have recently approved the foregoing instruction without specifically considering defendant's point. (See *People v. Catlin* (2001) 26 Cal.4th 81, 148, 151 [109 Cal.Rptr.2d 31, 26 P.3d 357].) We think that, like CALJIC No. 2.22, this instruction is unobjectionable when, as here, it is accompanied by the usual instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof. These instructions make it clear that a defendant is not required to absolutely preclude the element of deliberation.

We conclude that defendant's multifaceted challenge to the court's reasonable doubt and related instructions lacks merit.

D. *"Acquittal First" Instructions*

The court instructed the jury on first and second degree murder and manslaughter, explaining that the court could not accept a guilty verdict on second degree murder unless the jury first unanimously found defendant not guilty of first degree murder, and similarly could not accept a manslaughter verdict without an initial unanimous finding that he was not guilty of first or second degree murder. (CALJIC Nos. 8.75, 17.10.) Defendant now argues these instructions violated his constitutional right to full consideration of all lesser offenses, because "[a] jury which is deadlocked on the charged offense must be permitted to render a verdict (either conviction or acquittal) on a lesser offense, if they are able to do so."

As the Attorney General correctly observes, we have frequently rejected this and similar contentions. (*People v. Riel, supra,* 22 Cal.4th at pp. 1200-1201; see *People v. Fields* (1996) 13 Cal.4th 289, 308-311 [52 Cal.Rptr.2d 282, 914 P.2d 832]; *People v. Mickey* (1991) 54 Cal.3d 612, 672-673 [286 Cal.Rptr. 801, 818 P.2d 84].) We see no reason for reconsidering these decisions.

## III. PENALTY PHASE ISSUES

### A. *Voluntariness of Defendant's Narrative Testimony and Supposed "Waiver" of Counsel*

As previously noted, defendant testified at the penalty phase, against the advice of his counsel. He cautioned the jurors that persons serving life terms often get into more trouble, and told them he would choose the death penalty if the decision were up to him. Defendant now complains that the trial court failed to determine whether he made a knowing and voluntary decision to waive counsel and testify against counsel's advice. He also argues the trial court failed adequately to caution him against giving narrative testimony. These contentions lack merit.

The record shows that, once defense counsel indicated that defendant intended to testify against his advice, the court held a brief hearing to discuss the matter with defendant. The court first explained to him that although he had the right to testify, he might want to reconsider rejecting his counsel's advice. The court explained that defendant would be subject to cross-examination and limited as to the scope of his testimony. The court then gave him four hours to reconsider his position.

At the close of presentation of other defense witnesses, the court revisited the issue, observed again that defendant's counsel advised him against testifying, and explained that he would be subject to cross-examination. Defendant remained adamant that he wished to testify. The prosecutor, evidently concerned about possible appellate claims of incompetent counsel, suggested the court hold a "*Marsden*-type hearing" outside his presence. (See *People v. Marsden* (1970) 2 Cal.3d 118, 123-124 [84 Cal.Rptr. 156, 465 P.2d 44].)

Thereafter, outside the prosecutor's presence, defense counsel explained to the court that his client had not indicated what he intended to say, and that counsel was "concerned" defendant might say something "negative" that could be exploited on cross-examination. Counsel, although not agreeing to defendant's tactic, advised him to testify in narrative form, without any questioning from defense counsel, as counsel had no idea what the testimony would be. The court asked defendant if he wished to comment regarding his proposed testimony, and he replied "[n]ot personally." The court asked defendant whether he believed he needed the court's or counsel's assistance to help him make his statement, or whether he could present it without such assistance. He replied, "Yeah."

Following some inaudible whispered conversation between defendant and the court, the prosecutor returned to the courtroom and defendant made his narrative statement as described above.

■ As noted, defendant now contends the court failed to determine whether he made a knowing and voluntary waiver of his right to counsel. Of course, any such "waiver," and the consequent absence of counsel, was limited to defendant's narrative statement itself, as his counsel was fully available before and after the statement was given, including cross-examination. Defendant also complains of the court's failure specifically to advise him of his right to counsel's assistance during his testimony, of the dangers of narrative testimony, and of counsel's ability to conduct the direct examination himself, rather than permitting defendant to make a narrative statement.

Our review of the proceedings leads us to conclude that the trial court adequately and repeatedly admonished defendant regarding his refusal to follow counsel's advice and the dangers of taking the stand and testifying, and that the court committed no error in allowing defendant to exercise his right to address the jury. Defendant had "a fundamental right to testify in his own behalf, even if contrary to the advice of counsel. [Citation.]" (*People v. Guzman* (1988) 45 Cal.3d 915, 962 [248 Cal.Rptr. 467, 755 P.2d 917] (*Guzman*); accord, *Rock v. Arkansas* (1987) 483 U.S. 44, 49-53 [107 S.Ct. 2704, 2707-2710, 97 L.Ed.2d 37]; *People v. Webb* (1993) 6 Cal.4th 494, 534-535 [24 Cal.Rptr.2d 779, 862 P.2d 779].) Seen in this light, defendant at no time before, after, or during his narrative testimony "waived" his right to counsel's assistance—he merely exercised his fundamental right to testify.

Defendant observes that in *Guzman*, the trial court gave the defendant a panoply of additional warnings prior to his narrative testimony, advising him that his testimony would be subject to evidentiary objections, impeachment through prior convictions, and possible adverse inferences if he failed to explain or deny negative evidence. The court also explained to the defendant that he had a constitutional right not to testify and that no adverse inferences could be drawn from his silence. (*Guzman, supra,* 45 Cal.3d at pp. 941-942.) We note, however, that nowhere in our *Guzman* opinion did we suggest that such an array of admonishments was a necessary or constitutional prerequisite to receiving a defendant's testimony against advice of counsel.

We explained in *Guzman* that because counsel's assistance was, as here, available during all other stages of trial, "it was not necessary that the trial court's warnings about the dangers of self-representation be as complete as would be necessary for a defendant who sought to conduct his entire defense." (*Guzman, supra,* 45 Cal.3d at p. 946.) Here, as previously observed, defendant's counsel understandably suggested that defendant testify in narrative form without defense questioning, because counsel lacked any knowledge of what his client planned to say.

We conclude the trial court did not err in failing more extensively to warn defendant regarding the various rights he would forgo in testifying in narrative form, or to secure an express waiver of those rights.

### B. Failure to Conduct Extensive Marsden Hearing

In a related argument, defendant contends the court erred in failing to hold a more extensive *Marsden* hearing to inquire regarding a possible breakdown in defendant's relationship with his counsel resulting from counsel's advice not to testify at the penalty phase. In *Marsden*, we held that a criminal defendant has a right to substitute counsel on a proper showing that his constitutional right to counsel would otherwise be substantially impaired. (*People v. Marsden, supra,* 2 Cal.3d at p. 123.) We also held that the defendant is entitled to present evidence or argument on the matter of substitute counsel, assuming he has clearly indicated that he wants a substitute. (*Id.* at pp. 123-124; see *People v. Mendoza* (2000) 24 Cal.4th 130, 157 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Lucky* (1988) 45 Cal.3d 259, 281, fn. 8 [247 Cal.Rptr. 1, 753 P.2d 1052].)

The Attorney General correctly observes that defendant failed to question his counsel's competence or to request a hearing on the matter. Our review of the record shows only that *before* testifying, defendant was adamant about doing so, contrary to his counsel's advice, without explaining why, and without requesting new counsel or a hearing on the matter. Only *after* testifying, and *after* all penalty phase evidence had been presented, did defendant write a letter to the court complaining of a "conflict of interest" with his counsel arising from some phone calls defendant claimed he never made, and accusing counsel of not providing him with "paperwork" involving some witnesses, matters not shown to be critical to the defense. In this letter, defendant also indicated that counsel seemed "uninterested" in reading defendant's own notes taken from the preliminary hearing transcript, that counsel conferred with defendant only "at court," and that defendant was "extremely exhausted both mentally and physically" and unable to follow all of the trial testimony.

The trial court responded to the foregoing letter by telling defendant that disagreements with counsel over trial tactics often occur, and that nothing in defendant's letter afforded a ground for relief, although he could raise such matters in a motion for new trial at the conclusion of the case. No such motion was filed.

Defendant now asserts that the trial court erred in failing to hold an additional hearing to explore whether to order a substitution of counsel prior

to presentation of closing arguments. He relies primarily on the fact that defense counsel indicated he opposed defendant's decision to testify, having no knowledge of the nature of his proposed testimony, but we have held that such a "conflict" regarding tactical matters neither justifies substitution of counsel nor signals a fundamental breakdown in the attorney-client relationship. (*People v. Welch* (1999) 20 Cal.4th 701, 728-729 [85 Cal.Rptr.2d 203, 976 P.2d 754]; *People v. Lucky, supra*, 45 Cal.3d at p. 282.) As for the vague allegations in defendant's letter, at most they reflect a difference of opinion over trial tactics and some generalized complaints regarding counsel's performance, rather than a request for new counsel based on specific facts showing a deterioration of the attorney-client relationship. (See *People v. Padilla* (1995) 11 Cal.4th 891, 926-927 [47 Cal.Rptr.2d 426, 906 P.2d 388]; *People v. Lucky, supra*, 45 Cal.3d at pp. 281-283.) We conclude the court did not err in failing to hold a more extensive *Marsden* hearing at close of trial.

### C. *Effect of Defendant's Testimony on the Jury's Verdict*

Defendant next argues that his own testimony ("if it was my choice, not the jurors, I would have picked the death penalty") rendered the ensuing death judgment constitutionally unreliable. As previously noted, however, every defendant in a death case has the right to testify, even if contrary to counsel's advice, and even if that testimony indicates a preference for the death penalty. (*People v. Webb, supra*, 6 Cal.4th at pp. 534-535; *Guzman, supra*, 45 Cal.3d at pp. 961-963.) Defendant gives us no reason to reconsider those decisions. The jurors in this case were properly instructed that their duty was to decide the appropriate penalty, based on the law and the evidence, and defense counsel's closing arguments confirmed that principle and expressed skepticism about defendant's asserted preference for death. We find no error in permitting defendant to testify as to his preference for the death penalty.

### D. *Instructions Concerning Deadly Weapon in Jail Cell*

The prosecutor introduced evidence that defendant hid a metal "shank" in the corner of his jail cell. Accordingly, the trial court instructed the jury at the penalty phase that evidence had been introduced to show defendant committed a crime by bringing a deadly weapon into the county jail, conduct that "involves the implied use of force or violence or the threat of force or violence." The instruction further stated that before a juror could consider such activity as an aggravating circumstance (see § 190.3, factor (b)), that juror must find beyond a reasonable doubt that defendant did in fact commit the crime. (See CALJIC No. 8.87.) Although defendant now argues that possession of a weapon in his cell does not constitute an implied threat of

violence under section 190.3, we have held otherwise. (*People v. Smithey* (1999) 20 Cal.4th 936, 1002 [86 Cal.Rptr.2d 243, 978 P.2d 1171]; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 589 [15 Cal.Rptr.2d 382, 842 P.2d 1142]; *People v. Ramirez* (1990) 50 Cal.3d 1158, 1186-1187 [270 Cal.Rptr. 286, 791 P.2d 965].) Defendant offers no reason for reconsidering these decisions.

■ Defendant also complains that the court took the issue of implied threat out of the jury's hands, and created an improper "mandatory presumption" by instructing that evidence had been introduced that the shank incident "involv[ed] the implied use of force or violence or the threat of force or violence." As defendant observes, this instruction left it to the jurors to decide only whether, beyond a reasonable doubt, the incident in fact occurred.

We recently held that CALJIC No. 8.87 is not invalid for failing to submit to the jury the issue whether the defendant's acts involved the use, attempted use, or threat of force or violence. (*People v. Ochoa* (2001) 26 Cal.4th 398, 453 [110 Cal.Rptr.2d 324, 28 P.3d 78].) The question whether the acts occurred is certainly a factual matter for the jury, but the *characterization* of those acts as involving an express or implied use of force or violence, or the threat thereof, would be a legal matter properly decided by the court.

Contrary to defendant's argument, the instruction given here did not advise the jury that defendant's conduct amounted to an *actual or express* threat of violence, and no danger existed the jury would assume that an actual threat was made in this case. As the evidence made clear, defendant's illegal conduct amounted to *possessing* a shank in his cell, conduct that is properly deemed an *implied* threat of violence. (See *People v. Smithey, supra*, 20 Cal.4th at p. 1002.)

As noted, the court's instruction left it to the jury to decide whether, beyond a reasonable doubt, defendant possessed a shank in his cell. The court declined to reread the definition of "reasonable doubt," but did instruct that all relevant guilt phase instructions still applied, and that the jury could have copies of those instructions for its use on request. Defendant argues that the court erred in failing to *reinstruct* on the definition and concept of reasonable doubt (see CALJIC No. 2.90), for purposes of considering the "other crimes" evidence. Our cases have rejected this argument. (See *People v. Bolin* (1998) 18 Cal.4th 297, 342 [75 Cal.Rptr.2d 412, 956 P.2d 374], and cases cited; *People v. Payton* (1992) 3 Cal.4th 1050, 1068-1069 [13 Cal.Rptr.2d 526, 839 P.2d 1035].)

E. *Validity of Lying-in-Wait Special Circumstance*

Defendant next argues that the lying-in-wait special circumstance (§ 190.2, subd. (a)(15)) is invalid for failure to sufficiently narrow the class of persons eligible for death and to provide a meaningful basis for distinguishing the few cases in which death is imposed from the many cases in which it is not. (See *Furman v. Georgia* (1972) 408 U.S. 238, 313 [92 S.Ct. 2726, 2764, 33 L.Ed.2d 346] (conc. opn. of White, J.).) We have repeatedly rejected this contention, and defendant fails to convince us the matter warrants our reconsideration. (See *People v. Hillhouse, supra,* 27 Cal.4th at p. 510; *People v. Frye, supra,* 18 Cal.4th at p. 1029; *People v. Crittenden, supra,* 9 Cal.4th at pp. 154-156; *People v. Morales* (1989) 48 Cal.3d 527, 557-558 [257 Cal.Rptr. 64, 770 P.2d 244].)

■ Defendant's challenge is addressed to the statute on its face and he does not argue that the facts of the present case failed to support a lying-in-wait special circumstance. Nonetheless, we note the record amply demonstrates the applicability of the special circumstance. Defendant, after seemingly joking with his friend Edwin Skinner about stealing Joseph Viveiros's gun collection and "doing away" with Beatrice Viveiros, went to their house, engaged Beatrice in emptying his car trunk until her friend Kim Austin departed, and then ambushed her by shooting her in the back to facilitate stealing Joseph's gun collection.

F. *Constitutionality of Death Penalty Statute and Procedures*

Defendant asserts a variety of supposed flaws in California's death penalty statutes and procedures, including failing to designate the aggravating and mitigating factors, limiting the jury's consideration of defendant's mental disorders or duress exerted on him, failing to delete inapplicable sentencing factors, failing adequately to define mitigation, failing to advise the jury of its ability to vote for life imprisonment without parole despite the weight of aggravating circumstances, failing to require written findings, allowing multiple use and counting of aggravating evidence, failing to require a finding that death is appropriate beyond a reasonable doubt, and failing to require unanimity as to the truth of aggravating factors. We have recently and repeatedly rejected these contentions. (See, e.g., *People v. Hughes, supra,* 27 Cal.4th at pp. 404-406; *People v. Weaver* (2001) 26 Cal.4th 876, 991-993 [111 Cal.Rptr.2d 2, 29 P.3d 103]; *People v. Carpenter, supra,* 15 Cal.4th at pp. 417-418, 421; *People v. Bradford* (1997) 14 Cal.4th 1005, 1057-1059 [60 Cal.Rptr.2d 225, 929 P.2d 544].) We see no reason to reexamine those cases.

Defendant cites *Apprendi v. New Jersey, supra,* 530 U.S. 466, and *Ring v. Arizona, supra,* 536 U.S. 584, as justifying reconsideration of the foregoing

decisions. These cases, however, have no application to the penalty phase procedures of this state. (*People v. Prieto* (2003) 30 Cal.4th 226, 262-264, 271-272, 275 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; see *People v. Snow* (2003) 30 Cal.4th 43 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *People v. Smith* (2003) 30 Cal.4th 581, 642 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

## G. *Prosecutor's Discretion to Seek Death Penalty*

Defendant argues this state's death penalty law confers unguided discretion to prosecutors to charge the death penalty, resulting in arbitrary and irrational decisions. Again, we have often rejected the point and decline to reconsider it here. (See *People v. Weaver, supra,* 26 Cal.4th at p. 992; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1024 [30 Cal.Rptr.2d 818, 874 P.2d 248]; *People v. Keenan* (1988) 46 Cal.3d 478, 505 [250 Cal.Rptr. 550, 758 P.2d 1081].)

## H. *Disproportionate Penalty*

■ Defendant argues that imposing death on "a 19-year-old offender, with no previous criminal record, and with a history of emotional and family problems" would be a grossly disproportionate penalty. (See *People v. Dillon, supra,* 34 Cal.3d at p. 478.) As the Attorney General observes, however, at the time of the charged offenses, defendant had "suffered a sustained petition for arson, and was facing two additional charges, including a weapon-related offense." Defendant formulated a plan to commit robbery and murder, and to blame the crimes on his former roommate. After convincing his victim to open the safe containing the guns he coveted, defendant executed her by shooting her several times at close range while her back was turned. The murder was premeditated and deliberate, carried out after a period of watchful waiting until his victim turned her back on him. Defendant's possession of a shank in his prison cell casts doubt on his suitability for life imprisonment. Nothing in the record regarding defendant's background and supposed troubled state of mind compels a finding that death would be a grossly disproportionate punishment for his crimes.

## I. *Denial of Automatic Modification of Sentence Motion*

Defendant contends the trial court improperly (1) based its decision denying modification of sentence on his probation report, (2) ignored relevant mitigating evidence, and (3) treated certain mitigating evidence as aggravating. We find no basis for reversing the judgment.

### a. *Probation report*

The court, in the course of ruling on defendant's request for modification of sentence and sentencing him for the noncapital offenses, began by stating

that "Based on what I've heard of the recommendations from outside parties, including the victim's family, members of Mr. Nakahara's *and the probation department*—and I have done that and reviewed this case under [section] 190.3 of the Penal Code—and going back through the factors in aggravation and mitigation." (Italics added.) The court proceeded to summarize the various factors in aggravation and mitigation, including the circumstances of the crime, the presence of criminal activity involving the use or attempted use of force or violence, the absence of prior convictions, the lack of evidence of extreme mental or emotional distress, and the like.

The court concluded that "[o]n balance, and weighing the aggravation and mitigating circumstances, the court believes the factors in aggravation outweigh the factors in mitigation, particularly as to the crime itself." The court indicated that the strongest aggravating evidence was defendant's advance announcement of his intention to rob and kill Viveiros, and his statement to police to the effect that he put two bullets into his victim's back, and when she went to her knees and looked back at him, he shot her again in the head.

In summarizing its specific reasons for denying modification of the death verdict, the court made no mention whatever of the probation report or its contents. Immediately thereafter, the court turned to defendant's noncapital crimes, robbery and burglary, announcing that, before imposing sentence on *those* counts, "[I]t is *now* my function to read and review the probation report in this matter before I impose sentence *as to the other counts.*" (Italics added.) The court proceeded to sentence defendant to an additional term of 16 years for his noncapital offenses.

Defendant assumes that the court, in denying modification of sentence, was influenced by the information or recommendations in defendant's probation report, including the writer's opinion that defendant had an "uncooperative" and "evasive" attitude, was a "cold blooded killer with the object of killing to steal a valuable gun collection," and had "no place in society." ▮ We have repeatedly stated that "[a] trial court should not read or consider a presentence report before ruling on an automatic motion to modify penalty. [Citation.] If the court has done so, we examine the record to determine whether the court may have been improperly influenced by material in the report. [Citation.] If the court does not mention any material in the report when giving its reasons for denying the modification motion, we conclude there was no improper influence. [Citations.] Here, the trial court's statement of reasons cited only the evidence presented at trial, not extraneous information in the presentence report." (*People v. Kipp, supra,* 18 Cal.4th at p. 383.)

Likewise, in the present case we find no indication the trial court improperly relied on the opinions expressed in the probation report in ruling on the

automatic motion to modify. Accordingly, we find no reversible error in its consideration of that report. Absent contrary indication in the record, we must assume the trial court was not influenced by the probation report in ruling on the automatic motion to modify. (See *People v. Navarette* (2003) 30 Cal.4th 458, 526 [133 Cal.Rptr.2d 89, 66 P.3d 1182] [court considered modification motion on same day as sentencing hearing on noncapital crimes; nothing in record suggests court considered or relied on probation report when ruling on application for modification]; *People v. Seaton* (2001) 26 Cal.4th 598, 694 [110 Cal.Rptr.2d 441, 28 P.3d 175]; *People v. Riel, supra,* 22 Cal.4th at pp. 1221-1222.)

### b. *Disregarding mitigating evidence*

■ Defendant also contends the court, in denying the modification motion, erred in "disregarding" evidence of defendant's mental disturbance, including expert testimony that defendant suffered from attention deficit disorder and a passive-aggressive personality disorder. The record shows that in reviewing the list of statutory factors under section 190.3, the court made this comment regarding factor (d): " 'D,' whether or not he was under extreme mental or emotional disturbance at the time of the offense. That may have some merit, but there was no evidence of extreme mental duress [*sic*]. There was certainly evidence of some emotional disturbance during the time of this rather bizarre behavior and some statements that were a close enough call where I couldn't put that in any particular category."

Later, in evaluating factor (k) of section 190.3, the court commented that "Factor 'K,' any other circumstance, I found that to be a mitigating circumstance based on his childhood and what some of the things he went through as he was being raised." The court concluded, however, that "On balance, and weighing the aggravating and mitigating circumstances, the court believes the factors in aggravation outweigh the factors in mitigation, particularly as to the crime itself."

Defendant contends the court erred in failing to mention or consider the evidence of his "nonextreme" mental disorder under section 190.3, factor (k), as a circumstance that would extenuate the gravity of his crime. It is true that factor (k) does allow consideration of nonextreme mental or emotional conditions. (*People v. Turner* (1994) 8 Cal.4th 137, 208 [32 Cal.Rptr.2d 762, 878 P.2d 521], and cases cited.) It is also true that the trial court, in the present case, did not include defendant's mental disorder evidence in its discussion of the mitigating evidence. But we have held that the court, in reciting its reasons for denying the modification motion, need not discuss all

evidence the defendant submitted as supposedly mitigating. (*People v. Seaton, supra,* 26 Cal.4th at p. 694; *People v. Arias* (1996) 13 Cal.4th 92, 192 [51 Cal.Rptr.2d 770, 913 P.2d 980].) In any event, assuming the court erred in not considering defendant's expert evidence as potentially mitigating, no reasonable possibility exists that the error affected the court's ruling. (See *People v. Whitt* (1990) 51 Cal.3d 620, 660-661 [274 Cal.Rptr. 252, 798 P.2d 849]; *People v. Jones* (1997) 15 Cal.4th 119, 192 [61 Cal.Rptr.2d 386, 931 P.2d 960].) The court had heard, and certainly was aware of, defendant's evidence, yet it ultimately believed the aggravating evidence justified the jury's death verdict.

### c. *Davenport error*

■ Defendant contends the trial court erred in characterizing as "aggravating" defendant's capacity to appreciate the criminality of his conduct. In *People v. Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861], we explained that the failure to show the defendant's mental impairment is not an aggravating circumstance, but simply the absence of a mitigating one. Accordingly, the court may have erred in concluding that defendant's capacity to know right from wrong aggravated his offense. (*People v. Kaurish* (1990) 52 Cal.3d 648, 717 [276 Cal.Rptr. 788, 802 P.2d 278]; *People v. Marshall* (1990) 50 Cal.3d 907, 944 [269 Cal.Rptr. 269, 790 P.2d 676].) But the error was undoubtedly harmless in light of the other aggravating circumstances in the case, and no reasonable possibility exists that the error affected the court's ruling. (*People v. Whitt, supra,* 51 Cal.3d at pp. 660-661; *Kaurish, supra,* at p. 718; *Marshall, supra,* at pp. 944-945.) Certainly, the court was entitled to consider defendant's ability to appreciate the criminality of his conduct as yet another circumstance of his crime. (§ 190.3.)

### d. *Cumulative errors*

Defendant asserts the combined effect of the trial court's errors in denying defendant's modification request requires reversal. As we have seen, no serious errors were committed here. Whether viewed separately or in the aggregate, no reasonable possibility exists that these errors affected the court's decision to deny the request.

### IV. CONCLUSION

We affirm the judgment of death in its entirety.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Brown, J., and Moreno, J., concurred.