Filed 3/9/21  P. v. Baca CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C089946 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE005228) |
| v. | |
| JAMES MARTIN BACA, | |
| Defendant and Appellant. | |

This case involves the fatal shooting of Rebecca Temme's former girlfriend Leonora Montoya, during an armed robbery of Montoya and surviving victim Katherine Archuleta, perpetrated by Temme and her then-boyfriend, defendant James Baca.

On appeal, defendant contends his convictions for murder and robbery, as well as the true finding on the felony-murder special circumstance, must be reversed for insufficient evidence.  He further contends the trial court erred in excluding the details of

1

Archuleta's prior convictions, and character evidence related to Archuleta's credibility. We disagree and affirm.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

We only recite the facts and procedural detail necessary to the resolution of this appeal. Additional information relevant to the claims raised on appeal is discussed below.

*The Robbery and Murder*

In March 2017 Temme was dating defendant, who was a tattoo artist and drug dealer. Temme and Montoya, who was Temme's former girlfriend, assisted defendant in selling drugs. Defendant always carried a loaded gun for protection. In March 2017, he carried a .45 caliber handgun.

On March 18, 2017, Temme and Montoya got into a heated argument in the presence of defendant and Temme's aunt, Melodie Clark.[2] Immediately after Montoya left the area, Temme said, "I am going to kill that bitch." Defendant replied, "Baby, we can make that happen," and then pulled a gun from his waistband.[3] Thereafter, Clark,

---

[1] We affirmed codefendant Temme's conviction on September 24, 2020. (See *People v. Temme* (Sept. 24, 2020, C089885) [nonpub. opn.].)

[2] Three days earlier, Temme sent defendant a text message that read: "This bitch is really fucking pushing me so just know I do love you and I'm so sorry that shits been crazy tonight, but I'm beyond . . . good and I'm not about to be in this car with her anymore I'll do something stupid." It is unclear from the record whether Temme was referring to Montoya in this message.

[3] On March 6, 2017, Montoya sent defendant a message on Facebook indicating that she thought it was great that he and Temme were friends but noted that Temme was her "wife." In response, defendant said that he did not want to have sex with Temme, explaining that he did not "love her like that" and would not disrespect Montoya. During their exchange of messages, defendant told Montoya that he "sell[s] drugs [and] shoot[s] people."

who was Montoya's friend, warned her to stay away from Temme, explaining that defendant had a gun and that he and Temme might do something to her.

The next morning, Montoya hung out with her friend, Archuleta. They drank alcohol, used drugs together, and talked about Montoya being on the "outs" with Temme. At one point, Archuleta mentioned that she wanted a tattoo. In response, Montoya indicated that defendant was a good tattoo artist and showed her some photographs of his work. When Montoya called Temme, she was told that the tattoo Archuleta wanted would cost $30. Thereafter, Montoya contacted Temme, who arranged for defendant to give Archuleta a tattoo and to sell Montoya and/or Archuleta drugs.

Later that day, Montoya drove Archuleta and her friend, Ikon, to a gas station to meet up with Temme and defendant. They arrived around 8:30 p.m. Temme approached Montoya's car and said that defendant would not give Archuleta a tattoo because Montoya and Archuleta "weren't supposed to bring anybody with [them]." After Montoya dropped Ikon off at a nearby convenience store, she drove to a different gas station and picked Temme and defendant up. At the direction of Temme, Montoya eventually drove the group to defendant's motel room at the Surf Motel in Sacramento. They arrived at 9:07 p.m.

Defendant entered the motel room first, followed in order by Temme, Archuleta, and Montoya. After Montoya entered the room and sat down in a chair, Temme closed the door. As soon as the door was shut, defendant pulled out a gun, pointed it in the direction of Montoya and Archuleta, and ordered them to place their cell phones on the table. According to Archuleta, Temme did not seem surprised by defendant's actions.

After Archuleta placed her cell phone on the table, Temme said, "car key," which defendant repeated as he approached Montoya with his gun pointed at her. As Montoya started to speak, defendant shot her in the face. Temme and defendant immediately went through Montoya's pockets. When defendant turned and looked at Archuleta, she gave him all the money she had. Temme or defendant grabbed Archuleta's cell phone and

3

they fled the murder scene in Montoya's car. At defendant's direction, Temme drove to the San Francisco Bay Area. According to Archuleta, Montoya did not do anything to provoke the shooting.

*Apprehension of Defendant and Temme*

The following morning, Archuleta spoke with homicide detectives from the Sacramento County Sheriff's Department about the shooting. Around 5:10 p.m., a detective with that department spotted Montoya's car in Redwood City; Temme was driving and defendant was riding in the front passenger seat. When a Redwood City police officer attempted to stop the car, Temme sped off. A high-speed chase ensued, during which defendant threw a cell phone out the window. When Temme's path was blocked by a patrol car, defendant and Temme got out of Montoya's car and fled on foot. They were apprehended shortly thereafter. A loaded firearm magazine was found on defendant's person and a loaded handgun was found along the route defendant had taken while fleeing on foot. Three cell phones were found in the back of Montoya's car.

*The Investigation*

When homicide detectives responded to the scene of the shooting, Montoya was slumped over in a chair holding a closed pocketknife in her right hand. An autopsy revealed that she died of a single gunshot to the head. A .45 caliber spent bullet casing was found in the motel room. A firearms expert determined that the casing and the bullet that killed Montoya had been fired from the gun found when defendant and Temme were apprehended.

A review of security camera footage revealed that defendant, Temme, Montoya, and Archuleta arrived at the Surf Motel in Montoya's car at 9:07 p.m. on the evening of the shooting. Montoya, who was the last person to enter defendant's motel room, entered the room at 9:08 p.m. Less than a minute after Temme closed the door, defendant and Temme left the room and fled the area in Montoya's car. At 11:27 p.m., defendant sent a text message to someone using the name "Los Cervantes" indicating that he needed help

4

"really bad." The following afternoon, defendant sent another text message to Los Cervantes stating that he needed "plates."

During a jail visit following the shooting, Temme admitted to Clark (her aunt) that she took everything Montoya had on her person, including her car key. Temme also said that she loved defendant and that Archuleta was only alive because she had instructed defendant not to harm her. As for Montoya, Temme stated, "I don't give a shit about that bitch. Fuck her."

In late April 2019 Temme passed two notes to other inmates, instructing them to warn Archuleta that she was aware Archuleta intended on testifying against her and defendant, and that she would be "catching up with [Archuleta] real soon." Temme referred to Archuleta as a "lame snake ass snitching ass bitch" and stated that she would be "gunnin" for Archuleta.[4] Beginning on May 1, 2019, Archuleta testified as a prosecution witness. At that time, Archuleta was in custody for a felony she committed in 2018.

*Defendant's Testimony*

Defendant testified at trial; he claimed he shot Montoya in self-defense during a drug deal gone bad. He denied that the shooting occurred during a robbery of Montoya and Archuleta.

Defendant gave the following account of the shooting and the events leading up to the shooting: In the early evening of March 19, 2017, Temme told him that she had arranged a drug deal with Montoya and for him to give another person a tattoo. When he and Temme met Montoya at a gas station, he became upset and walked away because he thought he was being set up, as he believed the two people with Montoya (i.e., Archuleta

---

[4] The letters were written by "Harliquinn Baby Girl" and "B.G." Temme went by the nickname "Baby Girl."

and Ikon) were men.[5]  After Montoya dropped Ikon off, she and Archuleta met up with defendant and Temme at a different gas station.  At Temme's direction, Montoya eventually drove the group to defendant's motel room at the Surf Motel.  Defendant entered the room first followed by Temme, who stood in the doorway.  Although defendant was still worried that he was being set up, he weighed out some drugs and then started setting up his tattoo equipment.  At that moment, Archuleta entered the room, threw $30 on the bed, and grabbed the drugs.  Montoya then entered the room and Temme closed the door.  Montoya sat down in a chair and said, "Break yourself," which defendant understood to mean "give up what you got."  Montoya then reached toward her right side and started to stand up.  Because defendant believed that she was trying to rob and kill him, he immediately pulled out his gun and shot her.  Defendant then grabbed his tattoo equipment, the $30 Archuleta had thrown on the bed for the drugs, and the key to Montoya's car, which was on a table.  He and Temme then fled to the San Francisco Bay Area in Montoya's car.  Temme drove and he sat in the front passenger seat.

As for his apprehension the next day, defendant explained that a high-speed car chase ensued after he instructed Temme to "get out of there" when police officers started to follow them.  He further explained that he fled on foot from the pursuing officers after Temme stopped Montoya's car.  He admitted that he tossed his gun during the foot chase because it was "slowing [him] down."

*Charges, Verdicts, and Sentencing*

In January 2018 the People charged defendant with two counts of robbery with gun enhancements (Pen. Code, §§ 211, 12022.53, subd. (c), (d))[6], one count of first

---

[5]  During his testimony, defendant explained that he had been the victim of two attempted robberies during drug deals.  In one of those incidents, he was shot in the leg and one of his friends was shot and killed.  In the other incident, he was shot in the ankle.

[6]  Undesignated statutory references are to the Penal Code.

degree murder (§ 187, subd. (a)),[7] with the special circumstance that the murder was committed during the commission of a robbery (§ 190.2, subd. (a)(17)(A)), as well as a gun enhancement for discharging a firearm and causing the death of another (§ 12022.53, subd. (d)) and being a felon in possession of a firearm (§ 29800). Defendant had previously suffered a strike.

In May 2019 a jury found defendant guilty on all counts and found true the felony-murder special circumstance allegation as well as the firearm enhancement allegations. The trial court sentenced defendant to an aggregate term of life without the possibility of parole (LWOP) plus 58 years four months in state prison: LWOP for the murder of Montoya, 25 years to life for the associated firearm enhancement, consecutive 12-year terms for the robbery convictions with additional 20- and 25-year terms for the gun enhancements on the respective counts, with the robbery of Montoya and associated (25-year) gun enhancement stayed pursuant to section 654, and a consecutive term of 16 months for being a felon in possession of a firearm.

## DISCUSSION

### I

### *Sufficiency of the Evidence*

Defendant contends his convictions for the robbery of both victims and his conviction for felony murder with special circumstances must be reversed for insufficient evidence. We disagree.

---

[7] "Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "All murder that is perpetrated by . . . willful, deliberate and premeditated killing . . . or that is committed in the perpetration of, or attempt to perpetrate" certain specified felonies, including robbery, "is murder of the first degree." (§ 189, subd. (a).) "Felony murder and premeditated murder are not distinct crimes, and need not be separately pleaded." (*People v. Nakahara* (2003) 30 Cal.4th 705, 712.)

7

A. *Standard of Review and Relevant Statutes*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715 (*Edwards*).)

" 'The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215 (*Houston*).)

The jury is entitled to draw reasonable inferences based on the evidence (*People v. Livingston* (2012) 53 Cal.4th 1145, 1166), and we must accept all logical inferences the jury might have drawn from the evidence, even if we would have concluded otherwise (*People v. Salazar* (2016) 63 Cal.4th 214, 242). " 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis

8

whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Id*. at p. 357.)

B. *Robbery*

Robbery is the "taking of personal property in the possession of another, from [her] person or immediate presence, and against [her] will, accomplished by means of force or fear" (§ 211), and with the intent to permanently deprive the person of the property. (*People v. Marshall* (1997) 15 Cal.4th 1, 34.) "Robbery . . . has not occurred unless property was taken from the person's immediate presence and the defendant used force or fear to take the property or to prevent the person from resisting." (*People v. Scott* (2009) 45 Cal.4th 743, 749.)

For a taking to constitute robbery, "the evidence must show that the requisite intent to steal arose either before or during the commission of the act of force. [Citation.] '[I]f the intent arose only after the use of force against the victim, the taking will at most constitute a theft.' " (*Marshall, supra*, 15 Cal.4th at p. 34.)

Defendant first contends there was insufficient evidence he intended to permanently deprive the victims of their property. He adds there was insufficient evidence that any intent to steal from the victims arose either before or during the demonstration of force. We disagree.

To support his contention, defendant argues the evidence admitted at trial could be construed as an intent to separate the victims from their property only temporarily. This, he argues, is a "logical" inference from the evidence. Based on his view of the evidence, defendant surmises the phones were taken from the victims so they could not use them to call for help, and the car was taken only to get away from the crime scene. He further argues it would be "illogical" for him to steal a cell phone when he had a functioning cell phone of his own.

As we have explained, our task is to review the entire record *in the light most favorable to the judgment*, and we must presume " 'in support of the judgment the

9

existence of every fact the trier could reasonably deduce from the evidence.' " (*Edwards, supra,* 57 Cal.4th at p. 715.) The judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding. (*Houston, supra,* 54 Cal.4th at p. 1215.) "[I]f the evidence is such that rational people could reach conflicting conclusions, there is by definition substantial evidence to support the judgment." (*People v. Riley* (2015) 240 Cal.App.4th 1152, 1166.)

Here, there was ample evidence from which a reasonable jury could conclude that defendant, with help from Temme, intended before beginning the robbery to permanently deprive the victims of their property. We have detailed the evidence presented at trial that showed defendant and Temme lured Montoya and Archuleta to defendant's motel room under the pretense that he would give Archuleta a tattoo and sell Montoya and/or Archuleta drugs. Inside the room, defendant immediately pulled out a gun and demanded the victims' cell phones. Then Temme ordered Montoya to hand over her car key while defendant had Montoya at gunpoint, and defendant shot Montoya before she even had a chance to comply. After Montoya was shot, Temme expressed no surprise, but instead immediately went through Montoya's pockets and took items including her car key.

Following the shooting, Archuleta gave defendant all of her money, either Temme or defendant took Archuleta's cell phone, and Temme and defendant fled the scene and left town in Montoya's car. Finally, defendant and Temme attempted to evade police officers the following day both while driving and on foot. Temme told Clark during a jail visit that Archuleta was only alive because she had told defendant not to harm her--which there is no evidence happened at the time of the robbery, suggesting an earlier plan. From all the evidence, a reasonable inference certainly arises that defendant planned with Temme to rob Montoya and Archuleta in an armed ambush that would involve physical violence. Taken as a whole, defendant's conduct before, during, and after the crimes supports his robbery convictions. A rational trier of fact could find him guilty of this crime beyond a reasonable doubt.

10

C. *Felony Murder, Special Circumstances*

"The robbery-murder special circumstance applies to a murder 'committed while the defendant was engaged in . . . the commission of, [or] attempted commission of robbery.' (§ 190.2, subd. (a)(17)(A).) '[T]o prove a felony-murder special-circumstance allegation, the prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder.' [Citations.] To prove a robbery-murder special circumstance, the prosecution must prove the defendant formed the intent to steal before or while killing the victim. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27-28.)

Defendant first argues that because there was insufficient evidence of robbery, the special circumstances finding must be reversed. Because we have concluded *ante* that sufficient evidence supports the robbery convictions, this argument fails.

Next, defendant argues that the robbery, if it occurred, was only "incidental" to the murder and the special circumstance finding must be reversed on that ground. Again, we are not persuaded. As discussed in greater detail above, the evidence demonstrates that the armed defendant and Temme led the victims to a motel room, entered the room before the victims, immediately demanded the victims' property (including the car key), killed Montoya when she reacted to the demands, and fled in Montoya's car. It was reasonable for the jury to conclude, based on that evidence, that defendant formed the intent to rob the victims before Montoya's murder. (See *People v. Johnson* (2015) 60 Cal.4th 966, 988 ["The jury could readily conclude defendant intended to steal when he entered the victim's house with a weapon and beat her to death. It did not have to conclude he killed the victim . . . and only then decided to steal."].) Thus, the robbery was not *necessarily* merely incidental; although that is a conclusion that could possibly be reached by a reasonable jury, it is certainly reasonable to reach a contrary conclusion from the evidence we have described. We conclude sufficient evidence supports the special circumstance.

11

We note that in his reply brief, defendant argues "[i]n light of the prosecution's explicit claim that Montoya's murder was willful, deliberate and premeditated on the day prior to its commission, it follows that the robbery was incidental to the murder and not vice versa." We disagree. First, defendant's premise is flawed. At trial the People argued *two* theories by which defendant could be convicted of murder: felony murder or premeditated, malice murder. The jury was not required to identify upon which theory they found him guilty. Second, while there may have been evidence to support both theories of guilt, the jury is not required to weigh the evidence equally. We will not reweigh that evidence on appeal. (See *Houston, supra,* 54 Cal.4th at p. 1215 [courts of appeal do not reweigh evidence]; see also *People v. Zamudio, supra,* 43 Cal.4th at p. 357 ["reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict"].) This argument does not affect our conclusion that the special circumstance was properly found.

II

*Character Evidence*

Defendant next contends the trial court abused its discretion in excluding evidence of Archuleta's character and the details of her prior convictions. We find no abuse of discretion.

A. *Additional Background*

Prior to trial, the People moved to exclude impeachment of Archuleta with any convictions beyond her 2012 theft and 2013 second degree robbery convictions. Defendant filed his own motion pursuant to Evidence Code section 1103, seeking to admit character evidence: Archuleta's reputation for anger, violence, deceitful conduct, and performing violent acts in exchange for money.

Defendant also filed a supplemental motion seeking to introduce evidence of Archuleta's 2018 conviction for participation in a criminal street gang (§ 186.22, subd.

12

(a)) and other prior convictions beyond the theft and robbery. Defendant sought to question Archuleta about the facts that the 2013 robbery conviction was for a "home invasion robbery in concert with others," and the conduct underlying her conviction for participation in a criminal street gang included "luring" a man to a hotel room in order to rob him. Defendant further argued he should be able to cross-examine Archuleta regarding numerous social media posts wherein she purportedly advertised performing acts of violence in exchange for money.

At the hearing on the motions in limine, the trial court ruled that Archuleta's prior convictions for theft and robbery were admissible as impeachment evidence. Archuleta's conviction for robbery, the court indicated, must be sanitized because whether the robbery involved force or fear was not relevant to Archuleta's credibility. The court tentatively ruled that Archuleta's 2018 conviction for participation in a criminal street gang was a crime of moral turpitude, but deferred ruling on that issue pending additional research. On the issue of Archuleta's character, the court ruled that evidence was admissible only if defendant testified he acted in self-defense.

Prior to Archuleta's testimony at trial, defendant again objected to sanitizing her prior robbery conviction. Defendant argued it was relevant that the robbery was violent. The trial court affirmed its prior ruling that the conviction could be used to impeach Archuleta but could only be referred to as a "felony conviction involving a theft" or "a felony conviction involving moral turpitude."

The trial court also confirmed its tentative ruling that Archuleta's 2018 conviction for participation in a criminal street gang could be used as impeachment evidence, but without reference to gang affiliation or the underlying criminal conduct. Defendant voiced his objection, arguing that Archuleta's gang affiliation and her participation in a robbery where she was the "bait" to "lure" a victim would further undermine her credibility. The court explained its concern that evidence of Archuleta's gang affiliation

13

and those details of her participation would constitute improper character evidence. The prejudice of those details, it concluded, would outweigh any relevance.

During trial, Archuleta testified wearing her orange, prison-issue clothing. She acknowledged her lengthy criminal record, noting she had been "in and out of juvenile hall and stuff" since she was 16. She also admitted to smoking methamphetamine "socially" on the day in question, and drinking alcohol throughout the day, beginning in the morning. Archuleta testified that in 2012 she was convicted of stealing, she was convicted of another felony theft offense in 2013, and in 2018 she was convicted of an additional felony for which she was in custody at the time of trial.

B. *Applicable Legal Principles*

" 'When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify.' [Citation.]" (*Edwards, supra,* 57 Cal.4th at p. 722.) A prior felony conviction involving moral turpitude is admissible to impeach a witness on the theory that, even if the prior crime did not involve dishonesty, "moral depravity of any kind has some 'tendency in reason' [citation] to shake one's confidence in [the witness's] honesty." (*People v. Castro* (1985) 38 Cal.3d 301, 315; *People v. Gutierrez* (2018) 28 Cal.App.5th 85, 88.) We review the trial court's decision for abuse of discretion. (*People v. Bedolla* (2018) 28 Cal.App.5th 535, 555.)

C. *Analysis*

After giving a detailed recitation of our Supreme Court's decision in *People v. Dalton* (2019) 7 Cal.5th 166 (*Dalton*), the sum total of defendant's argument is that "the trial court's statements suggested that it may have been unaware that specific instances of misconduct that were relevant to prove a trait of the witness's character were admissible." Defendant, however, does not identify which of the trial court's statements he is referring

14

to and makes no cogent argument that the trial court misunderstood the law relative to the admissibility of prior misconduct.  The claim is thus forfeited.  (See *Estate of Cairns* (2010) 188 Cal.App.4th 937, 949.)

Moreover, when defendant raised this issue for a second time in the trial court at the hearing on his motion for a new trial, the trial court acknowledged the decision in *Dalton*, *supra*, 7 Cal.5th 166, but correctly noted it had discretion to exclude evidence under Evidence Code section 352.  The record does not, therefore, support defendant's claim that the court misunderstood its duty to admit relevant evidence.

Finally, even assuming it was error to exclude the additional impeachment evidence, and that error was preserved for appeal and properly raised in the briefing, the claim fails because defendant has not demonstrated how he was prejudiced by the purported error.  (*Dalton*, *supra*, 7 Cal.5th at p. 217 [erroneous exclusion of impeachment evidence is harmless unless there was a reasonable probability the defendant would have achieved a more favorable result had the error not occurred].)  Defendant argues that if the jury had heard details of Archuleta's participation in another hotel robbery, details which he presents as eerily similar as to defendant's version of the happenings at the hotel in this case, it would have questioned Archuleta's credibility.  The argument fails to persuade.

The jury had ample reason to question Archuleta's credibility; her character for dishonesty was made clear at trial.  She wore prison garb and acknowledged she was serving a prison sentence for a crime she committed after Montoya was killed.  She acknowledged having been in the criminal justice system since she was 16 years old.  She admitted to being high on methamphetamine and drinking throughout the day of the murder.  She acknowledged having been convicted of three crimes, two of which were theft-related.  Further details of her underlying crimes and her social media would not have cast her credibility in a significantly different light.  (*Dalton, supra,* 7 Cal.5th at p. 215.)  Further, as we have discussed in detail above, Archuleta's testimony was supported

15

by video evidence as well as defendant and Temme's actions after the killing, including their flight together, and Temme's statements to her aunt and others. Defendant has failed to establish that he would have received a different result had the excluded evidence been admitted. (*Ibid.*) Thus, even assuming for the sake of argument that the claim is preserved and the trial court's ruling was erroneous, any error was harmless.

## DISPOSITION

The judgment is affirmed.

                                          /s/

                                    Duarte, Acting P. J.

We concur:

/s/
Hoch, J.

/s/
Krause, J.

16